**STATE OF OHIO**
**DEPARTMENT OF EDUCATION**

IN THE MATTER OF
DUE PROCESS REQUEST FILED BY:

IMPARTIAL HEARING OFFICER
ANNE PIERO SILAGY

MR AND MRS. LESTER BARNEY
PARENTS OF ██████████

PETITIONERS

SE- 3042-2014

v.

AKRON PUBLIC
SCHOOL DISTRICT

RESPONDENT

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

**PROCEDURAL HISTORY**

On December 15, 2014, a due process complaint was signed by Attorney Daniel Bache

on behalf of Delaina and Lester Barney, parents of 8 year old ████ (hereinafter the Student),

a third grader in the Akron Public Schools (hereinafter District or Respondent) (Board Ex.

1).[1]. The complaint alleges multiple violations of IDEA including the following:

> The Student is not receiving FAPE
>
> The Student's education is not appropriate and is not being educated in the least restrictive environment.
>
> The Student is not being given the protections and services necessary for his education or to prevent severe reactions, illness of risk of death.
>
> The Student was not provided medicine when needed as instructed and thereby increased his susceptibility to allergy.

---

[1] The complaint misidentifies the name of the party above the signature line of the party requesting the hearing and incorrectly identifies the child's address and the name of the school that the student attends. (Board Ex. 1, Tr. 899)

EXHIBIT D

2

The Student's mother was laughed and made fun of due to her concerns over his safety.

The Student was segregated from other students, deprived of educational opportunities and deprived of extracurricular activities.

The District failed to provide an adequate ETR and IEP.

The District failed to properly implement the IEP.

The District failed to adequately protect the Student from bullying

The District's failure to implement the IEP has resulted in poor academic success and an increased allergy severity

The District has segregated from other students at lunch although the cafeteria is specifically ventilated for purpose of preventing allegoric reactions.

The complaint was received by the Ohio Department of Education on December 17, 2014. (Board Ex. 1) Anne Piero Silagy was appointed as the Impartial Hearing Officer on December 22, 2014.

Prior to the filing of the due process request, Petitioners' counsel made a written request for records on December 12, 2014. Documents were provided on a computer disk by the District to Petitioners' counsel on December 22, 2014. (Tr. 12)

By agreement of the parties, a telephone scheduling conference was held on January 14, 2015. The parties agreed to five dates for the hearing: February 18, 19, 20, 25 and 26 2015. In addition the parties agreed to hold the disclosure conference on February 9, 2015 at 10:00 am at the offices of the Akron Public School District. A Scheduling Order confirming the dates and times as well as setting forth the Hearing Officer's requirements that exhibits be premarked as well as providing sample witness lists and subpoena forms was forwarded on January 14, 2015 to counsel.

3

On February 9, 2015, the disclosure conference was held at the offices of the Akron Public Schools. The mother was present with her counsel. At that time, the District, through its counsel, provided a witness list and exhibits in compliance with the Hearing Officer's order. The Petitioners provided a disk of documents, with no pages numbers or index. The Petitioners also provided a list of approximately 70 witnesses, including the District's counsel as a potential witness. Petitioner's counsel was directed to pare down the witness list to those witnesses the Petitioner actually intended on calling no later than noon on Friday February 13, 2015. (Disclosure Tr. 11, 28) At the Disclosure Conference, the District requested that the Hearing Officer execute eight (8) subpoenas, which were signed at that time. The Mother indicated that she wished the hearing to be open to the public. (Disclosure Tr. 21) At the Disclosure Conference, the District provided a previously unprovided Action plan that was marked as Exhibit 3. (Tr. 22)

Instead of a pared down list, the Petitioners provided a supplement to the witness list. (Tr. 15) On Friday February 13, 2015 at 11:38 a.m. five days prior to the hearing, Petitioners emailed the Hearing Officer with a copy to Respondent's counsel and requested that the Hearing Officer issue subpoenas to sixteen (16) different witnesses. The Hearing Officer executed the subpoenas and emailed the signed copies back to Petitioners counsel at 3:31 p.m. and advised that the originals could be picked up on Monday if desired. Petitioners' counsel did not pick up the originals.

Petitioners did not provide a pared down witness list to the Respondent prior to the hearing. Instead, after inquiry from Respondent's counsel, by email dated February 13, 2015 at 2:41 p.m. Petitioner's counsel advised that the persons identified on the subpoenas were the witnesses that the Petitioners intended on calling.

4

The hearing commenced on February 18, 2015. At the onset of the hearing, Petitioners advised that lead counsel would be late. Petitioner's exhibit book was disorganized, incomplete, out of order in places and not properly paginated. Petitioners counsel then requested to use some of Respondent's exhibits. (Tr. 16)

Petitioners orally moved for sanctions against the District alleging that certain documents that were provided at the Disclosure conference had not been provided on the December 22, 2014 disk. The Petitioners alleged that the Action Plan attached as Exhibit 3 had not been provided to them in the disk, but acknowledged receipt of the document at the Disclosure Conference. Counsel admitted this was the only document at issue. (Tr. 22) The Hearing Officer denied the motion, finding that the all records in question had been provided at least by the Disclosure Conference and that the Disclosure Conference was held well in advance of the five day requirement under IDEA. (Tr. 23)

Petitioners did not attempt to serve subpoenas on the medical professional witnesses until the first day of the hearing. (Tr. 332) Accordingly, during hearing, Petitioners requested that additional hearing dates be scheduled in order to accommodate the need to bring in their medical experts and further moved for an extension of time for the decision in the matter. The District objected. The request was granted but limited Petitioners to one additional day only with the further stipulation that the District be advised no later than as to the identity of such witnesses and that any records relating to that professional are provided to the District at that time. The mother and her counsel agreed to schedule on one of three dates: March 25, 26 or 27, 2015. (Tr. 899-920)

At the conclusion of the February 26, 2015 hearing date neither party rested and Petitioners were instructed to advise the identities of any expert witnesses and the date

4

5

selected for the final day of hearing to both the Hearing Officer and District Counsel no later than March 2, 2015 at 3:00 p.m. (Tr. 1111-1113)

On February 27, 2015 the parties submitted a joint motion for extension of time in which to render a decision to May 15, 2015. That motion was granted by order dated March 2, 2015.

On March 2, 2015 the Petitioners advised the Hearing Officer and Respondent's counsel by email that they would not be calling any further witnesses and that counsel could be available prior to the three reserved dates in which to conclude the case. Both the Hearing Officer and Respondent's counsel provided several mutually acceptable dates in which to conclude the hearing. Petitioners counsel was advised that in the event an earlier date could not be agreed upon, the matter would resume on March 25, 2015 at 9:00 a.m. In response the Petitioners counsel stated that they were now unavailable most of the time on the reserved dates and were only available on March 25, 2015 at 4:00 p.m. or the afternoon of March 27th. Petitioners counsel reiterated that they now had other conflicts on the morning of March 25, 2015.

By order dated March 13, 2015 the parties were advised that the hearing would go forward on March 25, 2015 at 9:00 a.m. unless the parties could stipulate to their exhibits and further stipulate that no further witnesses were necessary. If so, the parties were to put the agreement in wiring and submit it to the Hearing Officer no later than March 23, 2015. In that event, Petitioners could obtain the consent of the District's counsel and submit a request to hold the hearing at 4:30 pm that day and submit that request to the Hearing Officer no later than noon on March 24, 2015. No such written stipulations were submitted.

5

6

At the March 25, 2015 hearing, neither of the Petitioners nor their counsel initially appeared at 9:00 a.m. Respondent's counsel contacted Petitioners' counsel and was advised that there had been some confusion and that Counsel would appear. Upon arrival over 50 minutes late, Counsel appeared without their client and advised that there would be no further witnesses and rested their case.

Respondent then moved for a directed verdict. Respondent's motion was granted in part and denied in part. Finding insufficient evidence that the Student had been not educated in the least restrictive environment, that the Student had regressed necessitating the provision of ESY services or that the Student had been disciplined for more than ten days, the claims relating to least restrictive environment, failure to provide ESY services and failure to conduct a manifestation determination were dismissed. (Tr. 1131-1132, 1142-1143). Concerned by the lack of evidence presented on multiple elements of the remaining claims, Petitioners were instructed to address in their brief what evidence they had presented to establish each of the elements of each of their remaining claims. (Tr. 1129-1144)

On April 20, 2015, the parties requested a further extension in which to submit their briefs until May 4, 2015 and that the time to render a decision be extended to June 11, 2015. That request was granted by order dated April 22, 2015. Both Petitioners and Respondent timely submitted their post-hearing briefs on May 4, 2015.

On May 5, 2015, the Petitioners filed a Motion for Reconsideration and Motion for Sanctions requesting that the Hearing Officer reconsider the directed verdict and to issue sanctions against the District for their alleged failure to produce documents to Petitioners.

7

## BACKGROUND HISTORY

The Student is an 8 year old third grader currently enrolled in the Akron Public Schools and suffers from ADHD, asthma as well as a severe peanut allergy. (Tr. 44)

The Student was initially enrolled in the Akron Public School District as a preschooler in 2001. (Board Ex. 6) (Tr. 90)

The Student's mother has herself struggled academically and was on an IEP while she was in school. (Tr. 853)

The Student went through multiple transitions since being enrolled in preschool, having been in and out of the Akron Public Schools on at least three occasions and enrolled in at least four different buildings. (Board Ex. 6) Multiple moves can negatively impact a student's progress under any IEP as they adjust to new teachers, new routines and new people. (Tr. 75, 135-136, 305, 405-406, 467, 939-940) For a child with the Student's needs, transfers would make it very difficult as he needs specially designed instruction on a consistent basis. (Tr. 76)

The 2014-2015 school years began on August 28, 2014 and the Student was enrolled at Glover CLC to start his third grade year. Less than two weeks later, the Student's parent transferred him to Crouse CLC. (Board Ex. 6)

Elizabeth Reed is the health aide at Crouse Elementary and has been with the Akron Public Schools for over ten (10) years. She is an employee of Akron Children's Hospital and is a state registered nurses aide (Tr. 1002, 1021). The school also employs a school nurse, who provides nursing services such as tube feedings and catherizations, for special needs students. (Tr.1074-1075)

8

During the 2014-2015 school years, the Student took the medication, Ritalin, daily for his ADHD which was administered by the school health aide at 11:00 each day. (Board Ex.13, Tr. 1003-1004) After he washes his hands, the medication is provided and the Student signs off and the aide sign off that she has witnessed him taking it. (Tr. 1004-1005)

The mother never reported any bullying to the school principal. (Tr. 930-931)

## THE 2014 RE-EVALUATION

Heather Bethem is the school psychologist for the Akron Public Schools and holds an educational specialist degree in school psychology and a bachelor's degree in education and a masters degree in school psychology. (Tr. 30)

The Student had been initially evaluated in preschool and was identified as qualified for special education services in the area of cognitive disability. (Tr. 70) The Student was re-evaluated in May 2014. (Board Ex. 9)

A traditional three year re-evaluation was conducted by Ms. Bethem which included an updated IQ assessment, updated academic assessment and updated parent information. (Tr. 30). Data was gathered from the Intervention specialist and an evaluation of adaptive behavior was completed. (Tr. 31, Board Ex. 9) The ETR report was completed, and the ETR meeting was held on May 23, 2014 (Board Ex. 9)

The mother was involved in the re-evaluation process. The mother was present during the planning process and gave consent. The District also met with the mother at the end of the evaluation process to go over the results. (Tr. 72) A parent questionnaire was given to the mother for the ETR. The parent questionnaire specifically asks about bullying and the mother

9

did not indicate any concerns. (Tr. 88) The mother signed off on the ETR after its completion. (Tr. 89)

The Student was given the Vineland2 to measure adaptive behavior and scored in the low range indicating that he needed more assistance to navigate through his school day. (Tr. 36)

The Student was administered the Woodcock Johnson III Edition Tests of Achievement to measure academic skills as well as one subtest from the Wechsler's Independent Achievement Test to assess his early reading skills. (Tr. 36-37)

The Student was also assessed using the Woodcock Johnson III Edition Tests of Cognitive Abilities to measure general intelligence. The Student scored a 62 in general intelligence falling significantly below the average range of 85 to 115. (Tr. 37) The Student was scored in verbal ability which captures a child's usage of language, synonyms, antonyms and picture vocabulary. The Student was scored in thinking ability which measures more of a nonverbal assessment and was scored in cognitive efficiency which deals with speed and memory. (Tr. 37-38)

While the ETR was being completed, the Student reportedly suffered a head injury, in a bicycle accident in the neighborhood; all testing however, had been completed prior to the injury except for the speech evaluation. (Tr. 40, 893) No re-testing was done after the injury as the scores were consistent with his prior evaluation. (Tr. 41)

The Student was also assessed using the Connors 3-T(S) which was completed by his Intervention Specialist. The Connor 3-T(s) is a short rating scale which gives a quick assessment of hyperactivity and impulsivity. The Student's scores were in three standard deviations above average consistent with his diagnosis of ADHD. (Tr. 47-48)

10

Academic assessments were also given to the Student. These assessments demonstrated that his academic skills were significantly delayed but commensurate with his ability and consistent with his level of independent functioning within the academic setting. (Tr. 55-56) His math skills measured at 78 within one standard deviation from average and are one of his strengths. (Tr. 65)

The ETR indicates that the Student is eligible for specially designed services through an IEP and for speech and language therapy as well as occupational therapy. (Board Ex. 9)

All students, including the Student would benefit from summer school. (Tr. 57-59)

The Students ETR also indicated some behavioral issues. (Tr. 62-63)

The IEP team determines the day to day instructional needs. (Tr. 78) The ETR does not determine what services are to be provided; it is used to determine eligibility. (Tr. 103-104).

The District offers after school reading intervention programs. (Tr. 80) The Student's mother did not register him for the program because he does not have transportation to get him home at 4:00 when it is over. Transportation has been provided to the Student to school due to his asthma. (Tr. 854-855)

The ETR states that the Student has severe allergies and that an epi-pen is kept at school. (Tr. 91-92, Ex. 9)

On the ETR, the mother reported that the Student had caused property damage with "older neighbors". (Tr. 886-887, Board Ex. 9, page 4). Mother also indicated that she had no concerns with bullying, but that the Student may be a follower at times. (Tr. 888, Board Ex. 9 page 27)

11

On or about July 21, 2014 the Student received a neuro-psychological evaluation at Akron Children's Hospital as a result of headaches and mood swings following a concussion on May 11, 2014 (the bicycle accident) and re-injury on June 3, 2014. (Petitioner's Ex. 4 at 23) The report indicates that the there is a "possibility that his concussion is related to mild worsening of attention and behavior". The report then states "this is expected to resolve but (the student) will have ongoing cognitive disabilities due to his way the brain developed".

The mother and the evaluator went over the report for over three hours. Even though the mother was not able to explain some of the data in the report, with the evaluator there explaining it she was able to understand, the same way with the IEP. (Tr. 839-840) The report notes that the Student has continued to report very significant headaches and recommends that the Student see a neurologist specializing in headaches at Akron Children's Hospital. (Tr. 864)

As a result of the July 21, 2014 evaluation, the Student was placed on Ritalin. (Tr. 890-891)

On September 16, 2014 the Student experienced an incident at school where he bumped his head and was diagnosed with another concussion. (Tr. 868 Petitioner's Ex.1 at 5-6)

### THE 2014-2015 IEP

Patricia McCluskey is the primary intervention specialist at Crouse Elementary school and has been there for 19 years. Ms. McCluskey was assigned the Student when he came to Crouse in 2009 (Tr. 242) Ms McCluskey was a member of the Student's IEP team. (Tr. 243)

Megan Nye is an occupational therapist and is a thirteen year employee of the Akron Public Scholl District. As an OT she addresses fine motor, visual perceptual skills and school

12

related self care activities. (Tr. 106) She is a current member of the IEP team for the Student after he transferred from Crouse to Glover and had been a member of the IEP team for the 2013-2014 IEP that was developed while he was at Leggett in second grade from October 2013 to February 2014. (Tr. 107. 117, 139-140, Ex. 11) She was never specifically trained in the use of an epi pen but is aware of how to use it. (Tr. 114)

Theresa Hudson was the Student's third grade teacher while at Crouse for the 2014-2015 school year. She has worked for the Akron Public Schools for 24 years, 22 of which have been at Crouse. (Tr. 338-339) Ms. Hudson was part of his IEP team for the 2014-2015 IEP. (Tr. 340)

For the 2013-2014 IEP, Ms. Nye collected data throughout the previous year to obtain a baseline and to assist with setting objective and goals. Ms. Nye drafted the OT goal and explained the reasoning behind the goal to the parent. No one on the team disagreed with the goal. (Tr. 130-132)

The IEP team met on November 7, 2014 to discuss the Student. Ms. McCluskey picked up the Student's mother so that she could be there that day. (Tr. 300) The meeting was held a week earlier than due since the Student was moving to a new school and the Student's mother was not available on November 10th. (Tr. 294-296) The IEP was brought in draft to discuss with the IEP team including the Student's mother. (Tr. 247) The IEP is commonly provided in draft to the parent prior to the meeting in order to facilitate discussion. (Tr. 293) The IEP team reviews all of the goals with the parent and reviews with the parent the data supporting the recommendations. (Tr. 295)

During the IEP meeting, the Student's mother was an active participant. She cried as she was pleased with his progress. (Tr. 300, 408-409)

13

The Student's IEP includes accommodations for testing, transportation. The Student takes a van to school provided by the District. (Tr. 981)

At the time, the Student was reading at mid-way through kindergarten level. (Tr. 344) The Student had been making great progress during his few short weeks at Crouse. (Tr. 349-350) At the time he arrived at Crouse, the Student knew about ten basic vocabulary words and was reading at the kindergarten level. (Tr. 298) At that time that he left Crouse two months days later, he had mastered 16 to 20 words. (Tr. 299) The Student has went from reading at a "B" level (0.5) to a "C" level (0.7) and was trying to progress to a "D" level. (Tr. 377, 392-393)

The IEP Section for "Other Information" is used to put in pertinent medical information (i.e. student wears glasses). (Tr. 1085)

Extended school year services are offered for student who are regress over the summer and who fails to recoup. (Tr. 253, 1086-1087) Ms. McCluskey has never been part of an IEP team that has offered ESY services to a student. (Tr. 253) The IEP team discussed ESY services and the Student was not offered ESY services. (Tr. 323-324)

ESY services are determined at the end of the school year by the IEP team based upon current data. (Tr. 125)

The IEP team did not feel that ESY services were necessary for the Student as he was progressing not regressing. (Tr. 303-304) All students, including the Student would benefit from summer school. (Tr. 57-59)

The IEP contains the following goal for occupational therapy: "Given adapted paper with clearly defined boundaries (the Student) will write a sentence with 80 percent accuracy for providing adequate spacing between words 3/3 sessions, by the end of the IEP". This goal

13

14

is accomplished using special paper that has a bottom section colored yellow that allows the child to focus on the boundaries and write lower case letters within the yellow space and learn how to correctly write tall letters between the lines. (Tr. 255)

The Student was exempted from the Third Grade Reading Guarantee due to his disability. (Tr. 257). The Student does not have a 504 plan. (Tr. 258)

The staff at Crouse reported no behavioral issues with the Student. (Tr. 301, 384-385, Board Ex. 8) This was a change from the behavior reported on the ETR and subsequent to the student being prescribed Ritalin. (Tr. 385-386)

The Student's mother signed the box on the IEP that indicated "I agree with the implementation of this IEP" and not the box "I am signing to show attendance, but do not agree with the Special Ed and related services specified." (Tr. 880-881, Board Ex.7, page 195). She also similarly signed the 2013-2014 IEP. (Tr. 882-883, Board Ex. 11)

The Student's mother did not ask for any accommodations at the 2014-2015 IEP meeting. (Tr. 884-885)

The Student's mother received a copy of "Whose Idea is It" at the IEP meeting. (Tr. 882)

Upon his departure from Crouse, the Student's mother gave Ms. McCluskey and Ms. Hudson thank you notes and a candle. (Tr. 302, 409)

After school programs, like bussing, food services, etc. are part of the general education curriculum that is offered all student regardless of their disability or high achievement. (Tr. 1090-1091).

14

15

Prior to the filing of the within due process complaint, no complaints or concerns were expressed by Petitioners regarding the implementation of the IEP or the need for additional services. (Tr. 941)

## PEANUT ALLERGY

The fact that a Student has a peanut allergy does not necessarily in and of itself prevents a student from accessing education. (Tr. 134)

The Student's mother has always been vigilant about alerting each the schools that her son has a severe peanut allergy. (Tr. 93, 950-951)

The Student has an Action Plan in place for his allergies. (Tr. 98) Prior to September 30, 2014 the Student had had one other allergic reaction while at school and that was during pre-school. (Tr. 877)

Medications are to be provided to the school when the Student is enrolled. Absent completion of the prescribed forms and providing the medication, the school cannot provide the medication to a student. (Tr. 460-461, Board Ex. 12)

When the Student was enrolled at Crouse, the Student's mother provided an epi-pen, Ritalin and an inhaler to the school. (Tr. 1003) The Parents did not provide the school with Benadryl. (Tr. 1004) Prior to September 30, 2014, Ms. Reed made several attempts to reach out to the mother to have her bring in Benadryl. (Tr. 1004) The epi-pen was stored in a locked cabinet. (Tr. 1032, 1088)

The epi-pen is to be used only if the child is experiencing a life-threatening injury. (Tr. 579) The principal is trained in the use of the epi-pen as well as the health aide and food service aide. (Tr. 953-954, 957)

16

Compliance with the Student's Action Plan does not require a medical opinion or require a specialized training to implement. (Tr. 580)

Angela Harper Brooks, the principal at Crouse, provided a list of the names of children with allergies to the staff. (Tr. 924)

In addition to a health aide, the school has a school nurse located in room 119 to handle any emergencies. (Tr. 928). The nurse is provided to students who are not able to access the regular education curriculum without some type of medical services. (Tr. 992)

The school policy is that if a child appears to be having an allergic reaction, they are to be sent to the health aide. (Tr. 947-948)   An Allergy Action Plan was provided to the Student's teacher. (Tr. 360-361)

The Student was not the only student in the class with a peanut allergy. (Tr. 260, 1008)

The District placed a sign indicating a peanut allergy and that no nuts were allowed in the three third grade classrooms as well as on the intervention specialist's door. (Tr. 261, Tr. 359, Tr. 1007-1008, Board Ex. 16).  All of the third grade classrooms are located in the same hallway. (Tr. 261, Petitioner's Ex. 9)  Signs are also placed outside other classrooms with students with peanut allergies. (Tr. 262, 1008)

The school has Fun Friday parties and the school made an effort to insure that the treats provided were safe for the Student to eat. (Tr. 386-387, 407)

Ms. McCluskey has a posting in her room proving information on emergency situations including anaphylactic shock. (Tr. 290-291)

The school day starts with the arrival of the students. The students are required to be there at 8:15 but are not required to have breakfast.  (Tr. 328, 463) However, almost all of the students take advantage of the free breakfast and lunch program.  Two shifts go into the

16

17

cafeteria to eat, the first shift is the primary grades and then the sixth graders, and the second shift arrives. The other grades eat in their classrooms with a breakfast cart that is brought to their hallway. (Tr. 262-263, 266-267). The doors open at 8:00 and breakfast is finished by 8:20 am. Classes start at 8:30 am. (Tr. 354) No other food is allowed in the classroom. (Tr. 357)

The first class for third graders is typically "specials", art, music or library from 8:30 to 9:20 a.m. and then to class for reading writing science and social studies from 9:20 to 11:00. Lunch is from 11:00 to 11:15 and then recess 11:15 to 11:30. After recess is math for 90 minutes until 1:00 and from 1:00 to the end of the day is reading or language arts. (Tr. 262-265, 354)

The three third grade classrooms are located on the second floor on a central hall and are located adjacent to each other or across the hall and are designated as rooms 224, 225 and 226. (Petitioner's Ex. 9). The intervention specialist (room 217A) and special classrooms (art, music etc) (room 221) are on the same hallway just a few doors away. (Tr. 269) All of the rooms have windows. Signs were placed on each of the doors indicating a nut allergy. (Tr. 269) The Student's homeroom is room 224 and his homeroom teacher is Mrs. Hudson. (Tr. 284)

Health aide gave out a list of all students with major health concerns in the building to the staff. (Tr. 270)

The menu for Crouse is contains the same items for each weekday. Every Tuesday is bagel day and the menu is bagel, cream cheese, peanut butter, margarine, jelly, fruit and milk. (Tr. 271, 356)

18

Almost all of the students at the school take advantage of the free lunch program. Very few, less than twenty, may pack their own lunch. (Tr.956-957) In fact no one in Mrs. Hudson room packs their own lunch. (Tr. 375) The Student eats lunch with several friends who do not eat peanut butter. The table is wiped off and cleaned prior to the Student receiving his lunch. (Tr. 682)

When there are extra-curricular activities and all children receive information about participating in an activity, the Student receives the same opportunity to participate. (Tr. 169)

While attending Akron Public Schools, the class went on a field trip to Hale Farm. The mother drove her son herself using her father's car because she felt that there would be too many other schools there and that they could have peanut butter sandwiches. She had the Student eat in her father's truck. (Tr. 680) No other field trips were taken while the Student was at Akron Public Schools. (Tr. 352) There is a no eating policy on buses in the Akron Public Schools. (Tr, 879-880)

A newsletter went out to the parents advising them not to send in any treats as there were students with allergies. (Tr. 272, 391)

Dr. Rajeev Kishore M.D. provided a list of recommendations to the school district for implementation for student with a nut allergy. This list was provided to the District in 2012 after the mother had requested that the school bus be cleaned down every day and the District had requested information to substantiate that request. After receipt, the District investigated the matter further and discovered that the list was recommendations for all children. (Tr. 1093-1096, Board Ex. 3) The District made it best efforts to implement the precautions. (Tr. 967)

18

19

## SEPTEMBER 30, 2014

On September 30, 2015 the breakfast cart that was sent to the Student's hallway on the second floor contained peanut butter packages. The packages are prepackaged small tubs and fully sealed. (Tr. 397)

The staff members noticed the peanut butter after some of the other students had been allowed to take the peanut butter into the classrooms. Upon discovering the error, the staff immediately pulled the Student aside before he reached his classroom and placed him in the intervention specialist's room away from the other students where he was able to eat his breakfast with her. (Tr.)

A telephone call was made to the Student's home and after a discussion with his grandfather it was decided that the Student would eat breakfast alone with the intervention specialist away from the other children. There was no peanut butter in her room and the Student ate his breakfast. (Tr. 309)

The three third grade teachers then cleaned their rooms with Clorox wipes while all of the Students were at specials in other classrooms. The Student went to Art class. (Tr. 273-275, 365-366) After Art class the Student went to language arts class and there were no discernible problems. (Tr. 314).

At approximately 10:45 am, the Student's mother called to check on her son and Mrs. Hudson went to check on the Student. At that time she noticed one red dot under his eye. She inquired of the mother whether that had been there earlier in the morning and was advised that it had not been there, so Ms. Hudson sent the Student with a buddy to see the health aide at the clinic. (Tr. 373 – 374, 388) The mother was advised that the school did not have Benadryl

20

and that she would need to bring it to the school. (Tr. 814, Petitioners Ex 1, Page 2c (3rd page in)

When the Student arrived at the clinic, Ms. Reed noticed one small red spot. He appeared otherwise normal and was not exhibiting any signs of distress or symptoms of a peanut allergy. (Tr. 1009-1110, 1047-1048) The Student was given his ADHD medication. (Board Ex, 13)

At approximately 11:30 the mother arrived at the school after attending her own doctor's appointment and requested to see her son. The Student was called down and his mother became upset and demanded that the health aide administer the epi-pen to the Student. The mother pulled a bottle of Benadryl out of her purse and gave him a dose. When the health aide refused to give him an epi-pen, the mother became more and more upset. She demanded that if the health aide would not get the epi-pen that she would. The Student who had not been in distress prior to his mother's arrival, became anxious and upset. (Tr. 819-820, 1011-1014, 1045-1046, 1060) The mother never asked for the epi-pen to be given to her, nor did she call 911 (Tr. 1046, 1056)

The health aide told the mother that if she wanted to give her son the epi-pen she could. The mother did not administer an epi-pen and alleges that she did not have one nor did the District offer her to use theirs. The mother insisted the staff call 911 and demanded to see the principal. (Tr. 1014-1015)

The principal, Angela Harper Brooks, who had been doing cafeteria duty while this was transpiring, was requested by Ms. Reed to come and talk with the mother. (Tr. 1014-1015) When the principal arrived approximately 10 to 30 minutes later she took the mother's concerns seriously. (Tr. 805, 961) The Principal did not note any swelling, puffiness, hives or

21

other signs of distress. (Tr. 934-935) Again, the mother was told that if she wanted to give her son the epi-pen that the mother could do so. The mother did not administer an epi-pen and requested to go the emergency room. The mother did not call 911, although if she wanted to she could have. (Tr. 970)

Ms. Brooks then drove the mother and her son to the emergency room at Akron Children's Hospital. (Tr. 936 ) The Student's father met them there and the Principal left without entering the building. (Tr. 823)

The emergency room records reflect that patient had a single hive around the eye. The records reflect the notation that the patient was positive for facial swelling. (Petitioner's Ex. 75)

The emergency room records indicated that the Student was given Pepcid and that he remained completely stable over a period of time and that he had normal vital signs and no signs of respiratory compromise or swelling in the back of the throat. (Tr. 584-585)

At no time was an epi-pen administered to the Student. (Tr. 1014)The hospital records do not reflect any epi-pen being administered nor do they reflect that anyone told the staff that an epi-pen had been administered. (Tr. 585) (Petitioner's Ex Page 75)

The following day, the Student was seen by his personal physician. He was provided an excuse from school until the following Monday October 6, 2014. (Tr.21, Tr. 1016)

On October 6, 2014, the Student returned to school and the mother brought a one-half bottle of Benadryl and additional pills of Ritalin to keep in the clinic. (Tr. 782, 1016)

On November 7, 2014, the Parent removed the Student from Crouse and stated that she was moving in with her parents. (Tr.1018) At that time, the mother was given back the Ritalin, inhaler and epi-pen. (Tr. 1019)

21

22

Peanut butter is no longer on the menu at Crouse. (Tr. 278. 937, 973)

The intervention specialist has never seen an epi-pen or been trained in the administration of an epi-pen. (Tr. 279)

The Student moved to Leggett Elementary on November 10, 2014. Upon learning of the Student's transfer, Ms McCluskey contacted the intervention specialist at Leggett to discuss the Student. (Tr. 292)

Out of the over 600 days that the Student has been in the Akron Public Schools, this is the only incident he has had regarding his peanut allergy. (Tr. 1080)

## LAW AND ANALYSIS

### *BURDEN OF PROOF*

The party alleging the denial of a free appropriate education or challenging the adequacy of an IEP bears the burden of proof by the preponderance of the evidence. *Kings Local School. Dist. Board of Education v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003); *Dong ex. rel. Dong v. Bd. of Education of the Rochester County School*, 197 F.3d 793, 799 (6th Cir. 1999); *Burilovich v. Bd. of Educ.*, 208 F.3d 560 (6th Cir. 2000); *Cordrey v Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990), cert. denied, 499 U.S. 938 (1991); *Elida Local School. Dist. Bd. Of Educ. V. Erkison*, 252 F.Supp.2d 476 (N.D. Ohio 2203). If the party claiming a denial of FAPE or challenging the adequacy of an IEP fails to meet that burden, then the party is not entitled to relief. *Doe v. Board of Educ.*, 9 F.3d 455, 460-461 (6th Cir. 1993) *cert. denied*, 511 U.S. 1108 (1994); *Doe v Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990).

22

23

## MOTION FOR DIRECTED VERDICT

A due process hearing is a quasi-judicial proceeding and contains requirements of notice, a hearing and an opportunity to introduce evidence. _See_, _Stancourt v. Worthington City School Dist._, 164 Ohio App. 3d 184, 207 (10th App. Dist. 2005). Hearing officers have the implied powers to manage cases before them so as to achieve the orderly and expeditious disposition of cases before them. _Id._ The hearing officer has a wide discretion with regard to conducting hearings, including the scope of the evidence and to limit the days for the hearing. See, _Ford v. Long Beach Unified School Dist._, 291 F.3d 1086 (9th Cir. 2002), _Dept of Educ., State of Hawaii_ v. E.B., 45 IDELR 249 (D. Hawaii 2006). See also, _Board of Education of Hillsdale Cmty Sch._, 32 IDELR 62 (Mich. SEA 1999), _Letter to Kerr_, 23 IDELR 364 (OSEP 1994). Admittedly, the Hearing Officer has never before issued a direct verdict in a case. However, the utter failure of the Petitioners to present even a prima facie case on each of the required elements on these issues compelled the verdict.. The reasons for the directed verdict are set forth below as well as in the hearing transcript. (Tr. 1142-1143)

## EXTENDED SCHOOL YEAR

It has been long established that extended school year services are appropriate for a disabled child if it would prevent significant regression of skills or knowledge retained by the child so as to seriously affect his progress towards self-sufficiency. See, _Cordrey v. Euckert_, 917 F.2d 1460, 1470 (6th Cir. 1990). Extended school year is the exception and not the rule and it is incumbent upon those imposing ESY for inclusion in a child's IEP to demonstrate, _in a particularized manner relating to the child, that ESY is necessary to avoid something more than adequately recoupable regression._ _Cordrey_ at 172-1473 (Emphasis added). It must be shown that ESY is necessary to permit the child to receive benefit from his instruction. ESY

23

24

proponent may establish entitlement to ESY through use of data or use of expert testimony. *Kenton Co. School Dist. V. Hunt*, 384 F.3d 269, 279 (6th Cir. 2004). Although a district should not be rewarded for failing to accumulate data in accordance with state law, the proponent still must establish through use of expert testimony, in a particularized manner relating to the individual child, that ESY is necessary to avoid something more than adequately recoupable regression. *Kenton* at 280 (addressing Kentucky state statutes that required a school district to maintain data on recoupment and regression).

A directed verdict was granted to the Respondent on this issue at the conclusion of the case. Petitioners completely failed to establish even one single element of this claim. There was no evidence of regression, no evidence of any difficulties the Student had with recoupment over breaks, and no evidence that ESY was necessary in order to benefit from his instruction. This was **Petitioners** burden.

Petitioners' Motion for Reconsideration relies exclusively on testimony from that implied that ESY was either not expressly discussed or considered at the IEP meeting[2] Even assuming this testimony to be true, this still falls woefully short of meeting their burden. The proponent still must establish through expert testimony in a particularized manner relating to this Student, that ESY is necessary to avoid the more than normal regression that typically occurs. Petitioners failed to produce even a scintilla of evidence that the Student was regressing or had difficulty recouping over breaks.

---

[2] Nor was there evidence that either parent requested or proposed ESY. (Tr. 929). There was also testimony that ESY was in fact discussed (Tr.   )

24

25

## LEAST RESTRICTIVE ENVIRONMENT

### *(Segregation from other students)*

The Act requires that disabled children be educated with their non-disabled peers whenever possible. 20 U.S.C. Section 1412(B)(5) mandates that States establish procedures to assure that, "to the maximum extent appropriate, children with disabilities…are educated with children who are not disabled, and that special classes, separate schooling, or other removal of the children from the regular education classroom only occurs when the nature and the severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. As numerous courts have recognized, this provision sets forth a "strong Congressional preference" for integrating children with disabilities in the regular classroom. *See e.g.*, *Devies v. Fairfax County School Board*, 882 F2d 876, 878 (4th Cir. 1989); *See also*, 34 C.F.R. 300.550. The least restrictive environment is one which confers some educational benefit but most closely approximates education with non-disabled children in the School that the child would attend is he had no disability. *See, Kerkham v. Superintendent*, 931 F.2d 84 (D.C. Cir. 1991).

A directed verdict was granted to the Respondent on this issue. Petitioners presented three claims that plausibly fall into this category: 1) the Student was isolated at lunch and/or during the field trip at Hale Farm; 2) that the Student was segregated from his peers for 15 minutes while eating his breakfast with Mrs. McCluskey on September 30, 2014; and 3) the Student was precluded from after school programs because transportation was not offered. For purposes of discussion, the Hearing Officer is accepting the Petitioners assumptions that eating breakfast and lunch would constitute a "removal" of a child from a "regular education

26

classroom" sufficient to assert a claim under the least restrictive environment requirement under IDEA.[3]

The first two claims are so weak they deserve little discussion.  First, breakfast is not part of the school day but more importantly the evidence was patently clear that the Student ate his breakfast with all of his peers in his homeroom - the exact same way as all other third, fourth and fifth graders.  It is uncontroverted that lunch was provided to him in the cafeteria with the other students and his friends.  Any isolation he may have felt on the field trip was minimal and due to the parent's decision, not the schools. The third claim also fails because the evidence convincingly demonstrated that the mother failed to respond to numerous inquires nor was there was any evidence that she ever communicated her concerns over transportation to the school.

## FAILURE TO CONDUCT A MANIFEST DETERMINATION

### (Suspension of more than Ten Days)

This is the third claim that was dismissed on a directed verdict at the conclusion of the testimony in this case.  There was absolutely no evidence that the Student had been suspended for more than ten days at any time. [4]

In their Motion for Reconsideration, the Petitioners claim that there "most likely" would be more evidence that the Student was disciplined for more than ten days as evidenced by the absence records. (Board Ex. 4). Petitioners surmise that there must be a more detailed breakdown of the absences that were not provided to them. The Hearing Officer is more than a little disconcerted at this belated suggestion.  How is it that the parents have no clue as to

---

[3] This type of claim is more appropriate under Section 504.
[4] In fact Petitioners do not even brief this issue.

26

whether or not their son was disciplined for more than ten days? How is it that Petitioners counsel made no effort to confirm how many days the Student was disciplined prior to filing the due process complaint? Or even before the hearing? What efforts to review the facts of this case, other than demanding copies of records, did the Petitioners make prior to moving forward with their case? There is no record that neither Petitioners nor their Counsel ever made a demand to inspect the records or review them at the District's Offices. See, 34 CFR 300. Moreover based upon the presentation of their case, the Hearing Officer has serious doubts as to whether Petitioners or their counsel timely and thoroughly reviewed the records that were turned over to them in December or at the Disclosure Conference.

### FAILURE TO IMPLEMENT IEP

In their brief the Petitioners cite the following two issues under this claim:

1. The Student was due to receive individualized instruction in all areas but was not.

2. Accommodations such as a wiggle seat, multiplication chart and modified homework were inconsistently provided

The foundation for the claim for individualized instruction in all areas was the neuropsychological report completed for the Student in July 2014 after his concussion, with no accompanying testimony by the author. The report however, only indicates that the concussion maybe responsible for the mild worsening of his attention and behavioral problems and notes that these conditions were expected to resolve itself. The report contains no specific IEP recommendations nor suggests that the IEP was deficient.

Whether or not certain accommodations were consistently provided also does not equate to a violation of IDEA. Absent a showing such failure impeded or affected his education progress then no substantive violation of IDEA has occurred.

28

### *THE IEP DID NOT ADDRESS ALL OF THE STUDENT'S NEEDS*

The Petitioners also summarily allege that the IEP failed to address the Student's unique needs – self –esteem issues, issues with self-consciousness, needed accommodations for extra-curricular activities, mood swings, counseling, aggression-deficiencies, attention issues, allergies, absences, digestive issues, behavioral issues, anger, bullying, bussing accommodations, socialization issues, and his inability to complete homework. Completely absent again, however, is any evidence that any of these issues impacted his ability to access his education, impeded his educational progress or any testimony of what special education related remedies are required. As the District has repeatedly emphasized, the Student qualified for special education services due to his **cognitive disabilities**. Simply providing blanket statements that a student has social, behavioral, physical or emotional needs (as many students do), without any nexus to a need for special education services is wholly insufficient.

### *FAILURE TO ADDRESS THE STUDENT'S SAFETY IN THE IEP*

Here the Petitioners challenge the IEP on the grounds that it did not include his Action Plan and the recommendations from Dr. Kishore in order to provide a safe environment for him.  As stated by the Respondent, there is no legal requirement under IDEA that his Action Plan or that the safety measures be fully incorporated into the IEP.

The IEP, or individualized education plan, is a written statement, developed at a meeting (the IEP meeting) between a qualified representative of the school district, the child's teacher, the child's parents or guardian, and, where appropriate, the child.  This written document must contain "a specific statement of the child's current performance levels, the child's short-term and long-term goals, the education and other services to be provided and

29

criteria for evaluating the child's progress." *Knable ex. rel. Knable v. Bexley City School District*, 238 F 3d 755, 763 (6th Cir. 2001) citing 20 U.S.C 1401 (a)(20).

This written document must contain annual goals and short-term instructional objectives, the specific instructional services to be provided, and objective criteria and evaluation procedures used to determine whether the objectives are to be achieved. See, 20 U.S.C Section 1401(11). An IEP must be reviewed at least annually and be revised to ensure that the child is receiving the appropriate education. See, 20 U.S.C. Section 1414(d)(4).

The District appropriately noted the Student's allergy in the section for "other information". While it was important to provide this information to alert staff to this need, it was completely unrelated to his need for special education services. The Student was not eligible for special education services because he had a peanut allergy. He was eligible for services because of his cognitive disability. It simply strains credulity that Petitioners have failed to recognize or accept this basic fundamental principle,[5]

### FAILURE TO PROVIDE MEASURABLE GOALS

Petitioners attack the OT's goal concerning handwriting skills. Petitioners argue that since the speech pathologist, a member of the IEP team was unable to explain the OT's objectives, then how could the parents possibly understand it? Quite noticeably, Petitioners made no inquiry of the OT to explain the goal or objectives, nor do Petitioners mention that another member of the IEP team could and did explain it.

The goal is in fact measurable, albeit it would require some explanation to someone unfamiliar with occupational therapy strategies and what adaptive paper is. However, the fact

---

[5] This is not to say that every child with a peanut allergy cannot be eligible for special education services. There may be very serious allergies which warrant home based instruction. This also is not to say that Section 504 may require accommodations to a student with peanut allergies.

29

30

that the goal needs some explanation by the author does not rise to the level of creating a substantive violation of IDEA without some evidence of resulting harm.

*FAILURE TO ADDRESS BULLYING*

The bullying of a student with a disability that results in the student not receiving meaningful educational benefit constitutes denial of a free appropriate education that under IDEA must be remedied. See, Dear Colleague Letter, 61 IDELR 263 (OSERS/OSEP 2013). The case law establishing the legal standard for analyzing these claims under IDEA is evolving. See, *T.K v. New York Department of Education,* 779 F Supp 2d 289, 312 (E.D.N.Y. 2011) and compare *M.K. v Fed. Way School Dist*, 394 F. 3d 634, 650 (9th Cir. 2005). A school district's liability for bullying was set forth in *Davis v Monroe County Board of Education*, 526 U.S. 629 (1999) In that case, the Supreme Court determined that in order to find liability on a bullying claim under the school district's response to peer on peer harassment had to be deliberately indifferent. The District urges that the Hearing Officer apply the same standard here.

While the evolving case law appears to be leaning toward a more lenient knowledge standard before imposing liability on a school district under IDEA, it is fundamental that the movant must first establish that bullying has actually transpired. This is where the Petitioners case fails. The Hearing Officer does not find sufficient credible evidence that bullying actually occurred. As will be further discussed later, the Hearing Officer does not feel the mother was the most credible witness. Her testimony on several issues was inconsistent. Her account lack detail and plausibility. Therefore, the Hearing Officer finds that bare factual allegations without any detail or corroborating evidence are insufficient to support the imposition of liability here for bullying.

30

31

## DEPRIVATION OF EDUCATIONAL OPPORTUNITIES

The evidence fails to show that the Student was deprived of any opportunity to participate any field trips.  The Student attended the Hale Farm field trip and was driven by his mother at her request. There was no credible evidence that he had to find his own way. The Student ate lunch with her there at her insistence.  There was absolutely no evidence of another field trip to a candy factory.

Petitioners brief also incorrectly asserts that the Student was forced to eat breakfast in the office instead of with his peers.[6]  The record is totally devoid of any such evidence.  The evidence was consistent that the Student, like all other third, fourth and fifth graders ate breakfast in their classroom. The only time he ate in Mrs. McCluskey's office was the morning of September 30, 2014 when he did so for his own safety and after the school consulted with his grandfather. (Tr. 925)

Petitioners brief also complain that the Student is segregated from his peers at lunch implying that he sits alone, but then backs off a bit and states that they might let a few friends sit with him but he doesn't get the "full experience" being in the cafeteria all the time or being with his friends all the time.  Once again, the evidence was overwhelming that the Student, like all other students, ate lunch in the cafeteria.  His table was sanitized first and then he is able to eat with his friends. (Tr. 925)

As to the after school programs, the District made attempts to have the Student attend the after school programs and that the mother ignored the requests.  There was no evidence that the mother made any attempt to register her child in the program or make a formal request for transportation.

---

[6] The Petitioners sole support for this allegation was the following testimony of Angela Harper Brooks on page 925 of the transcript which actually states:"Well, our third, fourth and fifth grade eat breakfast on the second

31

32

Petitioners also attempt to raise for the first time in their brief that since the Student has missed 67.5 days of school since the first day of school in January 2013 that the IEP team failed to address the issue. Other than the absence record and the mother's testimony that she could not recall how many days he missed because of his nebulizer, the record is completely devoid of any other information in which to support this claim.[7] To surmise from the testimony presented that his absences were somehow all related to his cognitive disability or a medical condition that required special education services would be pure conjecture and speculation by the Hearing Officer.

*LACK OF PROGRESS ON IEP GOALS*

The Petitioners next complain that the Student was not making adequate progress on his IEP goals in the area of speech vocabulary and reading. Interestingly the only testimony elicited by Petitioners in this case centered only upon the Student's progress while he was at Crouse from September 2014 to early November 2014 and no evidence was presented as it related to any other time period.

When measuring the Student's cognitive abilities with his progress in the two short months he was at Crouse the Hearing Officer is actually impressed. While the Student's cognitive testing shows significant deficient he was making great strides while at Crouse and was on track to closing the gap with his normal peers raising his achievement from 0.5 to 0.7. Unfortunately this progress was impeded by his fifth move in the past 15 months.[8] The Petitioners claim is again lacking merit.

---

floor. So I decided we wouldn't serve peanut butter on the second floor for breakfast." Petitioners' interpretation completely distorts the testimony presented.
[7] The transcript reads: Q Do you know how many days he missed because of that? A: I don't know. Q: You might not know, but I am going to ask you, do you know how many days he missed last year? A: Quite a few. Tr. at 856
[8] For the 2013-2014 school year, the Student started in the Tiffin City School District and transferred to the Akron Public Schools on October 8, 2013. Between October 8, 2013 and November 10, 2014, the Student attended Leggett, Glover, Crouse before returning to Leggett on November 10, 2014. (Board Ex. 6)

33

## LACK OF MEANINGFUL INPUT/PARTICIPATION

Petitioners also assert that they were denied a meaningful opportunity to participate in the IEP process alleging that the IEP team somehow forced or coerced the IEP upon the mother and that the IEP had been "predetermined". They also argue the failure to produce certain records deprived the Parents of their ability to properly prosecute their claims. This latter allegation will be discussed in a subsequent section.

IDEA requires that the IEP be developed in accordance with various procedures and requirements including provisions that afford parents an active and meaningful role in the development of the IEP. See, 20 USC Sections 1401(14), 1414(d). See also, _Honig v. Doe_, 428 U.S 305, 311(1988). The law requires that schools insure that the parents are provided an opportunity to participate in the IEP team meeting.

If a determination is made that a procedural violation of IDEA has been made, the inquiry does not end there. In order to constitute a denial of FAPE, it must be found that the procedural violation caused substantive harm. _Knable v. Bexley City Sch. Dist._ , 238 F.3d. 755, 764 (6th Cir. 2001). Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process, deprive the student of an individualized educational program, or result in the loss of an educational opportunity. Id. at 765-766. Thus if school staff unilaterally predetermines a child's IEP services or placement prior to the actual IEP meetings that include the parent, and then ignore parental input at the meeting, then a procedural violation has occurred.

This does not mean, however, that school officials are not permitted to form opinions and compile reports prior to IEP meetings See _Ms C. ex rel. N.L. v. Knox County Schools_, 315 F.3d 688, 693-694 n.3 (6th Cir. 2003). Predetermination is not synonymous with preparation.

33

34

It is clear that "school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and the parents have the opporuntity to make objections and suggestions." *Knox County Sch.* 315 at 694, see also, *Nack v. Orange County School District*, (6th Cir 2006).

In this case, the school district drafted the IEP so that the child would have one in place prior to his next move; moved the IEP meeting date to a date convenient for the mother; picked the mother up for the meeting and then actively engaged her input. The Petitioners want the Hearing Officer to focus on the fact that some of the IEP team members were not familiar with the sections that the other IEP team members were responsible for, such as OT. It is only logical, however, that each of the team members have their own specialized areas to provide input and would that those without that specialized experience would defer to the expertise of their fellow team members in the areas for which they are trained. Significantly, the mother does not dispute that the team met and attempted to discuss and explain the plan to her. She admits that she sometimes cannot comprehend some of the terminology used, but that after explanation she is able to understand. According, the Hearing Officer finds that the Petitioners have not met their burden on this issue.

## FAILURE TO PRODUCE RECORDS

At the onset of the hearing, the Petitioners moved for sanctions due to the alleged failure of the Respondent to produce records. The only record identified as not being produced on December 22, 2014 was the Action Plan which was marked as Exhibit 3 in the Exhibit Book that produced by Respondent at the Disclosure Conference. The motion was

35

denied as Counsel admitted that all records were either received in the December 22, 2014 records production or were exchanged at the Disclosure Conference.[9]

In its May 5, 2014 Motion of Reconsideration and Motion for Sanctions Petitioners now complain that additional records were not produced. The Petitioners allege that action plans, medication receipt sheets, detailed absence information and certain grade information, certain disciplinary information along with a list of types and locations of education records collected maintained or use by the agency.

IDEA affords parents access rights to certain records that are directly related to their child. 34 C.F.R. Section 300.562 provides:

> (a) Each participating agency shall permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part. The agency shall comply with a request without unnecessary delay and before any meeting regarding an IEP, or any hearing pursuant to Sections 300.507 and 300.521-300.528 and in no case more than 45 days after the request has been made.
>
> (b) The right to inspect and review education records under this section includes –
> (1) The right to a response from the participating agency to reasonable requests for explanations and interpretations of the records;
> (2) The right to request that the agency provide copies of the records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records;
> (3) The rights to have a representative of the parent inspect and review the records.
> .....

"Education records" is defined as the type of records covered by the definition contained in the Family Educational Rights and Privacy Act of 1974 (commonly referred to as

---

[9] IHO: Okay what specific records are you saying that you did not get? Mr. Bache: We did not get an allergy Action Plan which the School has as Exhibit 3 which is different from the Action Plan that we have. IHO: But that was provided at the Disclosure Conference? Mr. Bache: It was provided at the Disclosure Conference, You Honor. All of these items were provided at the Disclosure. IHO: Okay. So just for the record, any documents that you did not receive initially in the December 22nd were ultimately provided at the Disclosure Conference? Mr. Bache Yes, Your Honor. IHO: More than five days prior to the hearing"? Mr. Bache: Yes. IHO: More than adequate time to prepare for the hearing? Mr. Bache: Yes, Your Honor. IHO: All right. Your motion is denied. (Tr. 21-22).

35

36

FERPA). _See_ , 34 CFR 300.560    FERPA defines "education records" as those records that are:

> (1) Directly related to a student; and

> (2) Maintained by an educational agency or institution or by a party acting for the agency or institution.

_See_ , 34 C.F.R. Section 99.3. While the procedural safeguards established under IDEA require that parents have the opportunity to examine all records relating to their child, the Supreme Court has made it clear that the parental access to "education records" does not extend so far as to allow access to each individual piece of student work. _See, KC v. Fulton County School District_, 2006 WL 1868348 (N.D.Ga. June 30, 2006) citing _Owasso v. Indep. Sch. Dist. No. I-011 v. Falvo_, 534 U.S. 426 (2002). Furthermore, the records-access provisions of FERPA create no personal rights enforceable through a Section 1983 action. _See_, _Gonzaga University v. Doe_, 536 U.S. 273, 122 S. Ct. 2268, 153 L.Ed.2d 309 (2002); _United States v. Miami Univ._, 294 F.3d 797, 809 n. 11(6th Cir. 2002).

Under IDEA in order to show a procedural violation, the parents must show that their lack of access to the records "seriously infringed" upon their opportunity to participate in the educational process. _See, K.C. v. Fulton County School District_, _supra at 11_ citing _Knable ex. rel. Knable v. Bexley City School Independent Sch. District_, 238 F.3d 755, 765 (6th Cir. 2001). In evaluating whether a procedural defect has deprived a student of FAPE, the Court must consider the impact of the procedural defect, and not merely the defect per se. _See, Weiss v. School Bd. of Hillsborough County_, 141 F3d 994 (11th Cir. 1998). No single violation of the IDEA's procedures can be a per se violation of the Act. _Id._

37

Moreover, hearing officers under IDEA are without jurisdiction to hear cases relating to citations of FERPA. *See*, *Bd of Ed of Duanesbury Cent. Sch Dist.*, 20 IDELR 641, 645 (1993). Jurisdiction is limited to disputes arising under IDEA.

Missing from the motion is any detail as to when the Petitioners obtained these records[10] and how any of this impacted their right to meaningful participation in the due process hearing. Absent any such allegations, once again the Petitioners have failed to meet their burden.

## FAILURE TO RECONVENE IEP TEAM

Petitioners assert that the District should have reconvened the IEP team after the Student had a disciplinary event, suffered a concussion, or had behavioral or digestive issues. Conspicuously absent is any request by the parent that the IEP reconvene or any evidence that the Student's progress or education was negatively impacted by these events. The Petitioners demand that the Hearing Officer made the great leap from Exhibit 4's report of multiple absences to the conclusion that these absences were all somehow related to his disability. In light of the fact that the Student's own mother could not recall how many absences he had or the reasons therefore , the Hearing Officer will decline to speculate. More importantly, there is no evidence the Student's progress or performance had deteriorated. See, *Kings Local School District v Zelanzy*, 325 F.3d 724 (6th Cir. 2003). Simply put, the Petitioners have failed again to present into sufficient evidence to prosecute their claims.

## INADEDQUATE ETR

The final claim by Petitioners is that the ETF was "inadequate". Petitioners suggest that since the District failed to complete the re-evaluation within three years of the prior re-

---

[10] The Petitioners allege that they only recently became aware of these records. What is unclear is whether that is due to the failure of the District to produce the records or the more likely scenario that Petitioners failed to review all of the documents that were produced.

38

evaluation, IDEA was violated. Petitioners also claim that the ETR failed to consider his post testing concussion and that certain subtests were not administered because of his academic delays. Again they argue that new testing was warranted after his concussion, or due this medical conditions and/or absences.

There has been no showing by Petitioners that the failure to timely complete the re-evaluation had any impact on the Student or the services provided to him. In fact his re-evaluation was consistent with his prior re-evaluation. The school psychologist more than adequately explained the reason why certain subtlest were not appropriate due to his academic delays. No evidence was presented to counter this testimony. Accordingly, the claim is without merit.

## CREDIBILTIY ISSUES

The Hearing Officer has no doubt that the mother loves her son and wants what is best for him. She herself had academic struggles while in school and wants better for her son. But beyond that, her testimony was fraught with inconsistencies and therefore not credible. She states that she always goes everywhere with an epi-pen – yet did not have one that day at the school. She changed her story about bringing Benadryl once it was brought to her attention that it did not match her written notes. When it became apparent that evidence showed that no epi-pen was administered by the medical professional that day even at the hospital, then the testimony became that she gave administered one to her son and that was brought by his father, despite the fact that medical records refute an epi-pen being administered. She asks the Hearing Officer to believe that a parent who was always hyper-vigilant about her son's safety, forgot her purse when she went to her own doctor's appointment that morning, and despite the

39

fact that her son's life was in grave danger, she did not reach for the school's telephone to call 911. [11]

Make no doubt about it, this was a mistake and a serious one by the school to allow peanut butter on the breakfast cart and that it should serve as a warning to the school as to the need to continue to improve their protocols to insure the safety of its students. The Hearing Officer cannot however overlook the fact that for the past five years the school district has been successful in limiting the student's exposure to peanut butter, despite the multiple transfers and that corrective action was immediately taken. Perhaps the response was not perfect or even ideal, but there is simply no nexus of this incident to the provision of special education services.

It became apparent though the course of this hearing that the complaint was hastily thrown together. Very little thought, research or preparation was put into this case by Petitioners counsel prior to its presentation. The errors in the complaint, the apparent last minute assembly of an exhibit book, the inability to be punctual for hearings, the lack of focused questioning, the failure to identify the legal issues, and the failure to produce any credible evidence on the required elements for many of their claims, has profoundly disturbed the Hearing Officer.

Multiple days of hearing under IDEA for the District's mistake of placing peanut butter on a breakfast cart *with absolutely no evidence of how this impacted the Student's access to education or his ability to access to education other than missing those three and one half days of school* is distressing to this Hearing Officer. The other issues raised appear to be almost a pretext as very little valuable or relevant testimony or evidence was elicited on

---

[11] She also alleged that she could not call 911 using her phone because she was out of minutes. She was able to use it to take a photograph of her son.

39

40

those issues. The Hearing Officer does not have the authority to award attorney's fees or sanctions against counsel as Respondent would want, see, *Mr. B v. E. Granby Bd. Of Educ*, 201 F App'x 834 (2nd Cir 2006); *Wagner v. Logansport Cmty Sch*. Corp., 990 F. Supp 1099 (N.D. Ind 1997), but the weakness of this case as presented is so glaring that the Hearing Officer would be remiss not acknowledge Respondent's valid concerns.

## CONCLUSIONS OF LAW

The Student's disabilities did not require extended school year services in order to provide him FAPE.

The Student has been educated by the Akron Public Schools in the least restrictive environment

The Akron Public Schools is not impermissibly segregating the Student from his peers at breakfast, lunch or on field trips in violation of the Individuals with Disabilities Education Act.

The Akron Public School was not required to conduct a manifestation determination as there was no ten day suspension of the Student.

The Student's Action Plan or a safety plan is not required to be part of his IEP.

The Akron Public School District properly implemented the Student's IEP during the 2013-2014 and 2014-2015 school years.

The 2014-2015 IEP addresses all of the Student's unique needs

The 2014-2015 IEP contains measurable goals and objectives

The Student was not deprived of educational opportunities while a student in the Akron Public Schools

41

The Student made measurable progress on his IEP and has received meaningful educational benefit.

The Students parents were provided meaningful opportunity to participate in the ETR and IEP meetings.

The Akron Public Schools provided records to the Petitioners and there was no proof of lack of access to records that seriously infringed on Petitioners' opportunity to participate in the due process hearing.

The Akron Public Schools were not required to reconvene the IEP team after the Student suffered a concussion or had a disciplinary event or had behavioral or digestive issues.

The 2014 Evaluation Team Report is complete, through and adequate.

The Akron Public Schools has provided a free and appropriate public education to the Student.

IT IS THEREFORE ORDERED that the Due Process Complaint is hereby dismissed and Petitioners Motion for Reconsideration and Motion for Sanctions is hereby denied.

Impartial Hearing Officer

42

## NOTICE OF OPPORTUNITY TO APPEAL DECISION OF IMPARTIAL HEARING OFFICER OR BRING CIVIL ACTION TO APPEAL STATE LEVEL DECISION

1.    **Appeal from Decision of the Impartial Hearing Officer**: If you are not satisfied with the findings and decision of the impartial hearing officer, you may appeal the decision, in writing, to the Ohio Department of Education **within 45 days** of receipt of the hearing decision, under Revised Code Section 3323.05(H) and Rule 3301-51-05(K)(14)(b) of the Ohio Administrative Code (*Operating Standards for Ohio Educational Agencies Serving Children with Disabilities*).

To appeal from the decision of the Impartial Hearing Officer, you must file a Notice of Appeal that sets forth the order appealed and the reasons for your appeal.  You must file **both**:

    a.  The **original** Notice of Appeal with the Ohio Department of Education:

> Ohio Department of Education
> Office for Exceptional Children
> Procedural Safeguards Section
> 25 South Front Street, Mail Stop #202
> Columbus, Ohio 43215-4183

    b.  A **copy** of the Notice of Appeal with the other party to the due process hearing.

Upon receipt of your Notice of Appeal, the Ohio Department of Education will appoint a State Level Review Officer to review the decision of the Impartial Hearing Officer following the procedures outlined in Rule 3301-51-05(K)(14)(b)(iii).  At the conclusion of that review, the State Level Review Officer will issue a decision.

2.    **Appeal Right after State Level Review Decision**:  If you are not satisfied with the findings and decision of the state level review officer, you have the right to bring a civil action to appeal the decision, in writing, under Revised Code Section 3323.05(H) and Rule 3301-51-05(K)(17). You may file your civil action:

    a.  In the court of common pleas of the county in which the child's school district of residence is located within **45 days** of notification of the order of the state level review officer, under Chapter 119, of the Revised Code, as specified in Revised Code Section 3323.05(H), **or**

    b.  In a district court of the United States within **90 days** from the date of the decision of the state level review officer, regardless of the amount in controversy, as specified in 20 U.S.C. 1415(i)(2) and 34 C.F.R. 300.516.

### *Filing in Common Pleas Court*

If you bring your civil action in Ohio common pleas court, within **45 days** of notification of the order of the state level review officer, you must file:

1. A Notice of Appeal setting forth the order appealed from and stating that the SLRO's order is not supported by reliable, probative, and substantial evidence. If you wish, you may provide detail regarding the grounds for your appeal.

2. The Notice of Appeal must be filed with **both** the clerk of the court of common pleas and the Ohio Department of Education **within the 45 day timeline**. The address for the Ohio Department of Education is:

   > Ohio Department of Education
   > Office for Exceptional Children
   > Procedural Safeguards Section
   > 25 South Front Street, Mail Stop #202
   > Columbus, Ohio 43215-4183

3. You must mail a copy of the notice of appeal to the other party to the due process hearing.

### *Filing in Federal District Court*

If you choose to bring a civil action in the United States district court, **within 90 days from the date of the decision of the SLRO**, you must file your civil action in accordance with the court's requirements. You should call the clerk for the United States district court to determine that court's filing requirements.

44

## CERTIFICATE OF SERVICE

I herby certify that a copy of the foregoing Findings of Fact and Conclusions of Law Order was served by regular and overnight mail, postage prepaid and by email on this 11th day of June 2015.

Bernadette Laughlin
Ohio Department of Education
25 S. Front Street, #2
Columbus, Ohio 43215-4104

bernadette.laughlin@education.ohio.gov

Daniel R. Bache, Attorney
Jason Wallace
50 South Main Street
10th Floor
Akron, Ohio 44308

dbache@rlbllp.com
jwallace@rlbllp.com

Rhonda Porter
General Counsel
Akron, Public Schools
Legal Department
70 N. Broadway
Akron, Ohio 44308

rporter@akron,k12.oh.us

Delaina and Lester Barney
784 Allyn Street
Akron, Ohio 44311

delainabarney@gmail.com

_____
Anne Piero Silagy
Impartial Hearing Officer