## STATE OF OHIO
## DEPARTMENT OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

| | | |
|---|---|---|
| In The Matter of: | * | Case No. SE 3042-2014 |
| Impartial Due Process Hearing on behalf of ▇▇▇▇▇▇▇ | * | |
| | * | |
| Petitioner-Appellant | * | Monica R. Bohlen State Level Review Officer |
| and | * | |
| | * | |
| Akron Board of Education | * | |
| Respondent-Appellee | * | |

## FINAL DECISION AND ORDER

## I. SUMMARY OF DECISION:

Upon an examination of the record, the impartial hearing officer (IHO) properly found that ▇▇▇▇▇▇▇ (Student's) IEP was not inadequate because it did not provide for extended school year (ESY) services, that Student was educated in the least restrictive environment (LRE), that the Akron Public Schools (District or Appellee) is not impermissibly segregating the Student from his peers at breakfast, lunch or on field trips in violation of the IDEA, that the District was not required to conduct a manifestation determination as there was no ten day suspension of the Student, that Student's Action Plan or a safety plan is not required to be part of his IEP, that the District properly implemented the Student's IEP during the 2013-2014 and 2014-2015 school years, that the 2014-2015 addresses all Student's unique needs and contains measurable goals and objectives and Student was not deprived of educational opportunities while at District schools, that Student made measurable progress on his IEP and has received meaningful educational benefit, that Student's parents were provided meaningful opportunity to participate in the ETR and

1

EXHIBIT E

IEP meetings, that the District provided records to the Appellant and there was no proof of lack of access to records that seriously infringed on Appellant's opportunity to participate in the due process hearing, that there District was not required to reconvene an IEP team after Student suffered a concussion or had a disciplinary event or had behavioral or digestive issues, the 2014 Evaluation Team Report (ETR) is complete, thorough and adequate, and that the District has provided a free and appropriate public education (FAPE) to the Student. This review officer also finds that there was no substantive harm to Student because the ETR was late, that the records issue was not properly before the IHO and the IHO did not have jurisdiction to hear records issues under FERPA. Further, this review officer finds that the IHO was not biased and did not deny Parents a fair and impartial hearing.

The IHO's decision is affirmed.

## II. PROCEDURAL HISTORY:

This matter comes forward for state level review of the IHO's decision pursuant to an appeal submitted by the Parents.[1]

### A.    Due Process Hearing

This matter arises from a due process complaint filed by Parents, Delaina and Lester Barney (Appellant, Parent or Mother), on December 15, 2014  and received by ODE on December 17, 2014.[2] The factual allegations of the complaint were that the District denied Student a FAPE in that his education is not appropriate, he is not in the least restrictive environment, he suffers from several disabilities including ADHD as well as a peanut allergy and is not being given the protections and services necessary for his education or to prevent severe reactions, illness and risk of death, is being segregated from other students, and deprived of his educational, including

---

1   The Notice of Appeal was filed by "Petitioner-Appellant." It is unknown whether this refers to both parents on behalf of their child or Mother only. For consistency the singular term shall be used throughout this decision.
2   Page 1 of the Complaint referenced an inaccurate address for Parents and the wrong school attended.

2

extracurricular, opportunities. Further, Parents asserted that the District failed to provide an adequate and timely ETR and adequate IEP with meaningful parental input, to properly implement and maintain the IEP, and failed to provide protections from bullying. Further, the complaint alleged Student is continuing to struggle academically and claimed that Mother had to move child to a new school to assuage her fears for his safety.

As relief, Parent sought an order for the District to provide ESY services, compensatory education, safe learning environment, including peanut allergy safety protocols to be implemented and followed, Petitioners to be determined the prevailing party and attorney fees.

Parent requested an open hearing. Tr. 28.Testimony at the hearing was taken on February18, 19, 25, and 26, 2015.[3] During a colloquy about records on the first day of the hearing, Parent agreed that she had received all requested records from the District at the disclosure conference. Tr. 22. Testifying at the hearing, in addition to Mother,[4] were Heather Bethen, a school psychologist, Meghan Nye, an occupational therapist, Lori Timmons, the speech pathologist, Mary Ellen Brian, an intervention specialist at Leggett CLC (Leggett), Patricia MacCluskey, an intervention specialist at Crouse Elementary (Crouse), Nancy Richt, the principal at Glover CLC (Glover), Robert Calaway, Student's grandfather, William Smucker, M.D., a physician, Angela Harper-Brooks, the principal at Crouse, Elizabeth Reed, a health aide at Crouse, and Karen Liddell-Anderson, the Special Education Director. Student made a brief appearance at one of the hearings.

At the conclusion of the presentation of evidence the District moved the hearing officer for a directed verdict on all issues. The hearing officer granted a directed verdict on three issues, finding that Petitioner did not prove by a preponderance of the evidence that Student's IEP was inadequate because it did not provide for extended school year (ESY) services for Student, that

---

3  The last hearing on March 25, 2015 did not involve the taking of testimony.
4  Although Father signed the due process complaint he did not testify or attend any hearing.

3

Student's placement was not the least restrictive environment (LRE), and that Student was entitled to a manifestation determination hearing. On all other issues, the parties submitted post-hearing briefs.

The parties requested an extension of the time for briefs and the decision, which was granted by the IHO and Petitioners filed a Motion for Reconsideration and Motion for Sanctions {Anything else filed insert here- also what ruling on this].

On June 11, 2015, the IHO issued her decision concluding that she properly granted the District's Motion for a Directed Verdict, and on the remaining issues, finding that Petitioners did not prove by a preponderance of the evidence that the School failed to implement the IEP, that the IEP was inadequate in that it did not address all of the Student's needs, in that it failed to provide measurable goals, in that it failed to address bullying, Further, the IHO concluded that Student was not deprived of educational opportunities, showed progress on his IEP goals, that Petitioners did not prove a lack of meaningful input/participation on the IEP team, a failure to reconvene an IEP team after Student's accident, or that the ETR was inadequate. On the records issue that Petitioners raised for the first time during the hearing, the IHO determined that she had no jurisdiction to hear cases related to FERPA, and that there was no proof of how any lack of records impacted their right to a meaningful participation in the due process hearing.

### B. State Level Review

Petitioner-Appellant appealed the decision of the IHO. Appellant's notice of appeal was received by the ODE on July 27, 2015. Appellant did not state any reasons or grounds of the appeal. A conference call with counsel was conducted. Appellant's counsel requested an extension of the decision time-line in order to submit a brief and the Appellee did not object to the extension.

An Order Extending Time was issued on August 6, 2015 to allow for the filing of a brief by Appellant by September 11, 2015 (the time requested by Appellant) and a responsive brief by

4

Appellee by October 19, 2015. The decision due date was extended to November 9, 2015. On September 8, 2015, Appellant filed a Motion to Supplement the Notice of Appeal, seeking to supplement the Notice of Appeal with the following grounds of appeal:

1.    Appellant disagrees with the findings of fact and conclusions of law of [IHO] as issued June 11, 2015;

2.    Appellant believes all the claims raised below are valid and they did not receive a fair and impartial hearing.

3.    Appellant believes the IHO in this matter was biased and unable to be impartial in this hearing.

Appellee on the same day filed a Motion to Dismiss, and a Brief in Support of its Motion filed on September 9, 2015. On the same day, Appellant filed a Motion to Supplement the Record and to Compel Appellee to Produce All Educational Records and a Motion for New Hearing. An Order on Pending Motions was issued on September 28, 2015.  Both parties submitted briefs in a timely manner.

## III. FINDINGS OF FACT:

The IHO decision summarized the testimony at length and also made numerous findings of fact.[5] There were substantial factual disputes at the due process hearing. Findings of fact here and conclusions of law are based on an examination of the record of the IHO. Deference is given to the IHO on credibility assessments to the extent that such determinations are supported in the record. By way of background, factual summaries before this time period are included.

**Student disability**

Student is a third grader, who has received special education services since pre-school in the District. Bd.Ex. 9, p. 6. According to Student's most recent reevaluation (ETR), in May, 2014 Student continued to be eligible for special education services due to his cognitive disability. Tr.

---

5 Citations here to the transcript here are to "Tr. ___", to the Parents' Exhibits are to "P.Ex.__, p.___"and to the District's Exhibits are to "Bd.Ex.___, p.__."

50; Bd.Ex. 9, p. 30.  Student does not have a 504 Plan. Tr. 258.

**2013-2014 IEP**

At the time of the 2013-2014 IEP, Student was in the second grade at Leggett, having recently enrolled there. Tr. [ ]; Bd.Ex.11, p. 3. The IEP team met on November 18, 2013. Bd.Ex.11, p. 1. Meghan Nye was the occupational therapist and drafted the OT goal and explained the reasoning behind the goal to Parent. No one on the team disagreed with the goal. Tr. 130-132. Parent participated in the team meeting. The IEP noted under "Other Information" that Student has a peanut allergy. Bd.Ex.11, p. 2. The IEP team agreed that Student did not have behavior which impedes his learning or the learning of others. Bd.Ex.11, p. 3. Student's academic needs were described in the "Profile" section. Bd.Ex.11, p. 3. In Math he was on the intensive tier for intervention and was able to add and subtract basic numbers but needed reminders of the process for addition and subtraction. In  reading, he was on the intensive tier for instruction and was beginning to read repetitive books, 10 out of 40 preprimer words. When writing he could create good sentences orally but forgot the order of words when trying to write sentences and tended to mix up short vowels in cvc words.

He also had communication needs and it was noted that he had received speech services since preK. Student's speech sound production had improved and his speech intelligibility in conversation was adequate, but he continued to struggle with receptive language skills, particularly in recalling information and receptive vocabulary. Student was receiving OT and it was recommended that he continue with OT because of his below average eye hand coordination and attention to task noted in his 2/9/2012 ETR which adversely affected his written work.

The IEP set out five goals, addressing his weaknesses in the following areas: Numbers & Operations, Sight Recognition, Written Comprehension, Listening & Speaking, and School-based therapy (i.e. OT). Bd.Ex.11, pps, 4-8. Each goal had a measurable Benchmark(s)/Objective with a

6

date of mastery designated as November 17, 2014 and required progress summaries to be reported to Parent every 4.5 weeks, except in the Listening & Speaking area, every 9 weeks. Id. According to this IEP, Student was to receive specially-designed instruction by the Intervention Specialist (goals 1, 2 and 3) for a total of 180 minutes daily, the speech therapist (goal 4) for 120 minutes monthly, and the occupational therapist (goal 5) 60 minutes monthly. Bd.Ex.11, p. 9.

The LRE for Student was for him to spend part of his day in a resource room (from 21% to 60% of his time per week). Bd.Ex.11, p. 11. Accommodations (up to one hour of extra time on tests, oral reading of all test questions and answer choices, administration in a small group environment and the use of a highlighter) were provided Student in both the small group settings and his general education environment. Bd.Ex. 11, p. 9. The team determined that special transportation services were required, but no specifications or modifications were checked. Bd.Ex. 11, p. 10. Student was to be given notice of all extracurricular activities. Id. Extracurricular activities were included in the school's curriculum to enhance the education of students. Tr. 163. The team determined that ESY services are not necessary. Bd.Ex. 11, p. 11. Like all related services on an IEP, the issue of ESY is data driven. Tr. 1086. STOP

Mother signed this IEP, giving consent to the District to implement it. Bd.Ex. 11, p.14. The IEP indicated that a copy of the Procedural Safeguards Notice a copy of the IEP were given to Parent at the meeting and that a copy of the IEP was sent to Parent on November 19, 2013. Id. Throughout this IEP the blocks were filled out by computer, including the block consenting to the IEP. Mother would have to have signed it after the box was checked because a computer check could not have been added after the page was signed. Parent(s) did not file a due process complaint during the 2013-2014 school year.

Student had a history of school moves within the District since pre-school. Bd.Ex. 6, p. 1. In the 2013-2014 school year, Parent(s) enrolled Student in an out-of-District school in August,

2013 then transferred him to Leggett in the District on October 8, 2013, then to Glover, on February 14, 2014. Id. Multiple moves can negatively impact a student's progress under any IEP as the student must adjust to new teachers, environments, and students. Tr. 75, 135, 305, 405-406, 467, 939-940. Due to the nature of his disability, such moves would make it very difficult for him as he needs specially designed instruction on a consistent basis. Tr. 76, 136, 207.

While at Glover, Student had some behavior issues and one suspension. Bd.Ex. 6, p. 2. Mother also alleged Student was bullied at Voris (first grade) Glover. Tr. 649. Student's attendance at Voris was first grade. Bd.Ex. 6, p. 1. At Voris the school records indicate Student was the offender (i.e. bully) in two incidents with other students, both of which led to out of school suspensions. Bd.Ex. 6, p. 3; Bd.Ex. 7, pps. 1-2.Student received counseling weekly from a school-based Pastoral Counselor. Bd.Ex. 9, p. 6.

**2014 Reevaluation**

Student was due for his three year reevaluation under IDEA in February, 2015. His last evaluation team report (ETR) had concluded that he was eligible for special education in the category of cognitive disability and he had received speech therapy since pre-school. Bd.Ex. 9, p. 6. Mother was given all procedural protections and gave permission for the reevaluation on March 12, 2014. Bd.Ex. 9, p.1.[6] The school psychologist conducted a traditional reevaluation, which included an updated cognitive assessment, academic assessment and parent input. Tr. 30. Student was evaluated in the areas of adaptive behavior, Classroom-based evaluations and progress in the general curriculum, communication, cognitive, health/motor and social/emotional. Student's cognitive testing, using the Woodcock Johnson III Test of Cognitive Abilities, the Woodcock Johnson III tests of achievement, and the WIAT-III Early Reading Skills only, showed a mild delay, placing him significantly below the average range. Tr. 37;  Bd.Ex. 9, pps. 15-17. Academic

---

6   This exhibit had several page 1s. The pertinent page 1 cited here is titled PR-05 Parent Consent for Evaluation.

assessments, which were not required with a cognitive disability, were also done and demonstrated that Student's academic skills were significantly delayed but commensurate with his ability and consistent with his level of independent functioning within the academic setting. Tr. 55-56. His strengths were in math and his friendly, outgoing personality. Bd.Ex. 9, p. 21. In adaptive behavior, the Vineland2 was administered and Student scored in the low range indicating he needed more assistance to navigate through his school day. Tr. 36.

He was also found to have very elevated scores on the Conners 3-Ts rating scale for hyperactivity and impulsivity, consistent with his diagnosis of ADHD. Tr. 47-48. Mother reported she did not have him on medication for ADHD. Bd.Ex. 9, p. 6. The ETR also noted Student had some behavior issues. Tr. 62-63. Mother reported no concerns for bullying at the time of the reevaluation. Tr. 88; Bd.Ex. 9, p. 6. Student also has asthma (since birth), and food allergies, including peanuts. He uses an inhaler and nebulizer at home for his asthma. Tr.43, 543; Bd.Ex. 9, p. 6.

After Student's psychological evaluation but before his speech evaluation, Mother reported that Student had suffered a head injury in a bicycle accident. Tr. 40, 893; Bd.Ex. 9, p. 12. Mother submitted no report to the team showing the severity of the injury. Tr. 40.

The evaluation team met on May 23, 2014 to discuss the results of the evaluation and review the ETR. Tr. 33; Bd.Ex. 9. The team agreed that Student continued to be eligible for special education in the category of cognitive disability, based on his cognitive skills, communication, fine motor/sensory, academic skills, and adaptive skills as he continued to fall significantly below that of same age peers. Bd.Ex. 9, p. 30. Although Student was also noted to have ADHD symptoms, those symptoms were not the disabling condition found by the team that led to Student's eligibility for special education. Tr. 50. ADHD was secondary. Tr. 51. Results of the most recent speech and language testing and occupational/fine motor/sensory testing indicated that he continued to be

eligible for speech and language services and occupational therapy. Id.  Student's OT was to include sensory breaks, and adaptive equipment, which may include a wiggle seat. Bd.Ex. 9, p. 28.[7] Mother signed the report and checked the box that indicated "agree" with the conclusion of the report. Tr. 89; Bd.Ex. 9, p. 28.[8]

During the summer, Mother had a neuro-psychological evaluation of Student following his two head injuries, the first in May and the second in June. P.Ex. 1, p. 23. The report indicated that when Mother took Student to the hospital over the bicycle incident he was examined and released. Mother then took him back to the ER the next day and the ER ran a CT scan that was normal but on that day they diagnosed a concussion. P.Ex. 1, p. 23. The report, dated July 21, 2014, recommended that Student continue to be educated under an IEP (Cognitive Disability category) and that Parents must understand that "learning academic content will always be a struggle for him." P.Ex. 1, p. 25. Further, the report recommended medication for his ADHD (the "most effective treatment"), and clarified that Student suffered a concussion only after one of the incidents and he was expected to recover fully from the concussion within a month. P.Ex. 1, p. 23, 26.  Mother, who had been reluctant to put Student on Ritalin, started him on it. Tr. 626. His Ritalin was helping his behavior. Tr. 630, 779. There was no evidence that Mother gave the neuro-psychological report to the IEP team at Crouse.

**2014-2015 School Year**

At the beginning of the 2014-2015 school year, Student started the year at Glover. Bd.Ex. 6. Soon after the school year started, Mother transferred Student to Crouse Elementary (Crouse) on September 8, 2014. Bd.Ex. 6. Theresa Hudson, at Crouse for twenty-two years, became Student's third grade general education teacher and a member of his IEP team. Tr. 340.  Patricia MacCluskey, a nineteen year District teacher, became Student's intervention specialist (IS) and was

7   There are two page 28s in Bd.Ex. 9. This is the first.
8   This is the second page 28 in Bd.Ex. 9.

a member of his IEP team. Tr. 242-243. Meghan Nye became his occupational therapist and member of his IEP team. Tr. 106. The Crouse staff reviewed his IEP to determine what services were to be provided. Tr. 977. The teachers were introducing a new reading curriculum with extensive orientation. Tr. 298. When Student enrolled he was reading at a mid-way through kindergarten level and knew about 10 basic vocabulary words and within 45 days he knew 16-20 words. Tr. 299, 344. He made meaningful educational progress while at Crouse. Tr. 300. Teachers had no behavior problems with Student. Tr. 378. MacCluskey did not see the same child described in the ETR with respect to behavior. Tr. 301.

**Peanut allergy**

Student has been diagnosed with a peanut allergy and allergies to other foods. Bd.Ex. 3, pps. 3-4. Student was knowledgeable about his allergy and responsible to avoid peanut foods. Tr. 309. Many children in the District are afflicted with either asthma or various allergies, approximately 4,380 children district-wide, including other children at Crouse. Tr. 128, 260, 1008, 1106. These includes disabled and nondisabled children. All children with peanut allergies do not need an IEP. Tr. 975. The Akron Children's Hospital prepared an Allergy Action Plan (Plan), dated August 1, 2014, to be submitted to Student's school. Tr. 98; Bd.Ex. 3, p. 1. The Plan, which was maintained with the health aide at Crouse, spelled out what was to be done if Student suffered an allergic reaction while at school. Tr. Bd.Ex. 3, pps. 1-2. The school policy is that if a child appears to be having an allergic reaction, he or she is to be sent to the health aide. Tr. 947-948. A copy of the Plan was provided to the Student's teacher and she put it on her bulletin board. Tr. 360-61.

In 2012, Parent also submitted to one of Student's schools a letter from Dr. Rajeev Kishore, Student's allergist, with a list of recommendations for the schools on becoming peanut free. Bd.Ex. 3, p. 3. The school already had in place many of these recommendations but when the director of special ed saw the letter, she became concerned because the Dr. recommended that allergy

11

medications not be locked up, which would be a violation of Ohio law. Tr. 1092. She called Dr. Kishore's office to discuss her concerns and based on the call, she understood this was a generic letter sent to all his patients with recommendations only. Tr. 1092. Dr. Smucker, who was affiliated with a clinic where Parent and Student used to be patients, reviewed Dr. Kishore's recommendation letter and opined that he didn't know how plausible the recommendations were but he wouldn't be against them. Tr. 559, 565, and 567.

The health aide at Crouse, Ms. Reed, also gave out a list of all students with major health concerns in the building to the staff. Tr. 270. The District required all medications to be provided by the parents and these medications were maintained in Reed's office in a locked cabinet. Tr. 1032, 1088. Mother furnished Reed with Student's Ritalin, his inhaler and an EpiPen for his allergies, but not Benadryl. Tr. 91-92, 1003-1004; Bd.Ex. 9. Reed contacted Mother several times to follow-up about the Benadryl. Tr. 1032, 1088. Reed administered Ritalin to the Student every day at about 11:00 am. Tr. 1005 ; Bd.Ex. 13. pps. 2-3. She, thus, interacted with Student daily and described him as always happy-go-lucky. Tr. 1005. According to the Plan, the EpiPen is to be used only if the child is experiencing a major reaction (such as facial swelling, wheezing, cough, difficulty breathing). Bd.Ex. 3, p.1. If the symptom was a slight rash, he was to be given Benadryl. Id. Student's Plan does not require a medical opinion or require specialized training to implement. Tr. 580.

After Student's teachers became aware that he had a peanut allergy, they placed a "No Peanuts" sign at the door to Student's homeroom on the second floor of the school and at various other places on the second floor, including Student's intervention specialist's door. Tr. 261, 290-291, 359, 1007-1008; Bd.Ex. 16. Many of the District staff were well aware of asthma, serious allergies and allergic reaction symptoms from their training, their own personal experience or that of one of their children. Tr. 112, 114, 150, 188, 926, 1097.

Students at Crouse qualify for the federal free breakfast program. Tr. 267. Breakfasts for third graders, like Student, are served in the homerooms, while lunch is typically served in the cafeteria. Tr. 262-263, 266-267. Peanut butter in sealed individual containers was generally available to the student population for breakfast on Tuesdays for bagel day, along with sealed cream cheese, margarine, jelly, fruit and milk. Tr. 271, 356. When Student came to Crouse, however, the principal, Ms. Brooks, instructed the food servers that peanut butter containers not be sent to the second floor. Tr. 925. Student wasn't the only child with a peanut allergy. Tr. 260.

The students on the second floor had the other choices on the breakfast cart, but no peanut butter. The individual student picks his own choice of container and other breakfast items from a cart and takes it into his homeroom to eat it. Breakfasts are typically served between 8:00 am to about 8:20 am and classes start at 8:30 am. No other food is allowed in the classroom. Tr. 357. After breakfasts the homeroom tables are wiped down and the classroom is otherwise tidied for class. Student, while at Crouse, ate lunch in the cafeteria with other third grade boys who were not eating peanut products. Tr. 925. Students did not bring packed lunches typically. Tr. 357. Teachers wipe off the table that Student eats at before he sits down. Tr. 682. The school staff strives to do the best they can in their environment to keep children safe. Tr. 326.

**September 30, 2014**

On the morning of Tuesday, September 30, 2014, Student's intervention specialist, Ms. MacCluskey, was told by a food server that sealed peanut butter containers were on the food cart. Tr, 273. MacCluskey called Student's Parent to report that and to ask if it would be alright if she took Student to eat his breakfast in her office that morning. Tr. 275. Mother was ill that day and not available, so MacCluskey called Student's grandfather to inform him about the peanut butter and to discuss her plan of removing him from the classroom for breakfast. Tr. 273, 700. It was agreed that Student would eat with MacCluskey in her office. Tr. 273, 309. Later that morning, after breakfast,

13

Student went on to his specials, and while the third graders were at specials, the three homeroom teachers cleaned their tables as usual and Student was out of the homeroom for about an hour and a half. Tr. 275, 370.

Later, Mother called the homeroom teacher, Ms. Hudson, and asked her to check on Student to make sure he was not having any reaction. Tr. 373-374, 388. Hudson checked and observed a small red spot under his eye that she thought she should mention to Mother, and asked her if he had that when he came to school. When Mother said "no", Hudson sent him to Reed's office to be checked out as any rash was to be reported. Tr. 374. Hudson saw no signs of facial swelling. Tr. 419. Mother said she would come to the school after her doctor appointment to check on Student.

At about 11:00 am Student came to Reed to get his Ritalin, as usual, and Reed had been asked to observe the red dot. Reed observed the small barely visible red dot which was not raised and concluded it was nothing that stands out and Student looked the same as he always did. Tr. 1010, 1039. Reed concluded that Student did not have an allergic reaction that day. Tr. 1047. Student was not exhibiting any symptoms of any physical distress or symptoms of a peanut allergy reaction and appeared totally normal. Tr. 1009-1110, 1047-1048. The Student was given his Ritalin and sent back to his class. The incident reminded Reed about the Benadryl so she called Mother to remind her once again to bring Benadryl to the school. Tr. 814, 1030.

When Mother arrived to Reed's office about 11:30 am she asked that Student be brought to Reed's office. Tr. 1011. When Student was brought down, he was bubbly and excited and said he was having a good time and wanted to go back upstairs. Tr. 1012. Mother said "no" he couldn't go back and she drew out of her purse a vial of some liquid, gave Student a dose, and put it back in her purse. Tr. 1013. She asked Reed to administer the EpiPen to Student and Reed declined, explaining to Mother that Student did not need it. Tr. 1055. The EpiPen should only be

14

administered according to Student's Plan in a life-threatening situation. Tr. 1064.

This started a conflict between Reed and Mother because Reed disagreed with Mother that anything was wrong with Student. Mother then went to the secretary in the next office and was loud and upset and insisted that secretary call 911. Tr. 1014. Student who had initially been very happy and requested to go back to his class became increasingly anxious and upset as his mother carried on with the secretary. Tr. 819-820, 1011-1014, 1045-1046, 1060. Despite Mother's orders to what others at the school should do, she did not provide the school with Benadryl as requested, she did not disclose what liquid she had administered to Student, she did not ask Reed to give her the EpiPen, she did not administer the EpiPen at the school, and she did not call 911. Tr. 970, 1046, 1056.

In a while, the principal, Angela Harper-Brooks, who had a good relationship with Mother, came in from cafeteria duties and went to Reed's office. Tr. 931. Mother was saying 911 needed to be called and that Student needed his EpiPen and Reed wouldn't give it to him. Tr. 931. Mother just kept going on about calling 911. Tr. 933. Mother kept pointing to Student's face and Student did not look like he was in any distress, but he looked sad, teary-eyed. Tr. 933. Harper-Brooks opined that the more agitated Mother was getting the more teary-eyed and upset Student was getting. Tr. 934. Harper-Brooks did not think that 911 should be called. Tr. 970. She asked Mother what she wanted to do and when Mother said she wanted to go to the hospital she offered to drive her there. Tr. 934. Mother does not drive due to a depression anxiety disorder. Tr. 617. Neither the health aide, teacher, or principal saw any symptoms of facial swelling, puffiness, hives, or other signs of an allergic reaction, only a small red dot. Tr. 419, 934-935. MacCluskey, who saw Student throughout the morning, had no concerns of an allergic reaction that day. Tr. 290, 314.

Harper-Brooks then drove Mother and her son to the emergency room (ER) at Akron Children's Hospital. Tr. 936. The Student's father met them there and the Principal left without

15

entering the building. Tr. 823. Mother did not return Student to School until Monday, October 6, 2014, delivering a typed note from a nurse practitioner stating: "[Student] was seen in my office on 10/1/2014 at 2:30 PM." Under that were the handwritten words: "Pt to be out till Mon Oct 6." Bd.Ex. 21. There was no evidence as to who wrote the handwritten words. Student was out of school for three days with no evidence of any basis for the absence other than that note submitted by Mother. Dr. Smucker, who reviewed the note, opined that it was unclear why the nurse practitioner would recommend that he stay out of school until the 6th. Tr. 575. When Student returned to school on October 6, 2014, Mother brought a one-half bottle of Benadryl and additional Ritalin pills to keep in the clinic. Tr. 782, 1016.

Student had had no prior allergic reactions while at District schools. Student had had only two allergic reactions in his whole life before this school year, both occurring in pre-school. Tr. 877-878. Mother stated that these incidents occurred while Student was in an unidentified preschool where Mother worked. Tr. 555-57. The second of those preschool incidents involved another employee who refused to call 911 at Mother's direction. Tr. 558. Mother administered an EpiPen to Student on both of those occasions. Tr. 557-558.

**2014-2015 IEP**

The IEP team met on November 7, 2014. Bd.Ex. 10, p. 1. MacCluskey transported Mother to and from the meeting. Tr. 300, 302. The meeting was held a week earlier than due since Student was moving to a new school soon. Tr. 243, 294-296. The IEP was brought in draft to the parent prior to the meeting in order to facilitate discussion. Tr. 293. The IEP noted that Student was trying hard in all his academics this year, but that "when he misses school it interrupts the process." Bd.Ex. 10, p. 2. Student had been reading at a "B" level (0.5) to a "C" level (0.7) and was trying to progress to a "D" level. Tr. 377, 392-393. During the IEP meeting, District staff, including his occupational therapist, reported Student had been making great progress during his short time at

16

Crouse. Tr. 117, 350. Student exhibited no behavior problems and this was a change from the ETR and followed Student being placed on Ritalin. Tr. 301, 384-385. Mother cried at the meeting over Student's progress and the absence of behavior problems as reported by his teachers. Tr. 300, 408-409. The IEP notes Mother's recognition of Student's progress. Bd.Ex. 10, p. 2. The IEP also noted Student's severe peanut allergy in the "other information" section. Bd.Ex. 10, p. 1.

The IEP set out five goals, addressing his weaknesses in the following areas: Speech, Fine Motor, Reading, Writing, and Math. Bd.Ex. 10, pps, 4-8. These goals were different than the prior year's goals. Bd.Ex. 10, pps, 4-8. The team reviewed all of the goals with the parent and reviewed with the parent the data supporting the recommendations. Tr. 295. In Speech, Student's progress in his prior goals (articulation, intelligibility, and vocabulary building, developing his listening comprehension skills) was noted and the new goal was focused on continuing his progress on listening comprehension skills, working on his ability to recall information, answering WH questions and comprehending and using grade-level vocabulary. Bd.Ex. 10, p. 4.

His OT goal continued to focus on improving his writing skills with a focus on improving his recognizable letter formation, spacing between words, letter sizing, and placing letters on the writing line. Bd.Ex. 10, p. 5. The reading goal was to master reading at a third grade level, improve his reading fluency and correctly answer comprehension questions. Bd.Ex. 10, p. 6. His goals for writing were to demonstrate command of the conventions of standard English capitalization, punctuation and spelling. Bd.Ex. 10, p. 7. His goals for Math were to continue to improve in addition and subtraction and to introduce multiplication and work on those skills. Bd.Ex. 10, p. 8. Each goal had a measurable Benchmark(s)/Objective with a date of mastery designated as November 10, 2015 and required progress summaries to be reported to Parent every 4.5 weeks, except in the Speech and OT goals, every 9 weeks. Id. According to this IEP, Student was to receive specially-designed instruction by the Intervention Specialist (goals 2, 4 and 5) for a total of

90 minutes weekly, the speech therapist (goal 1) for 90 minutes monthly, and the occupational therapist (goal 2) 60 minutes monthly. Bd.Ex. 10, p. 9.

The LRE for Student was for him to spend part of his day in a resource room. Bd.Ex. 10, p. 11. If the child is not receiving all special education services with nondisabled peers, the team must justify it, which they did with the statement: "Services may take place outside of the general education classroom to provide a limited distraction environment to allow for guided practice, repetition, immediate feedback and consistent reinforcement." Bd.Ex. 10, p. 11. Accommodations (small group, extended time, breaks during test, oral reading of test questions, except for reading "when" only questions, and answers and directions are read), were provided Student in both the small group settings and his general education environment when working on Goals 2, 4 and 5. Bd.Ex. 10, p. 10. Mother did not request any other accommodations. Tr. 884-885. The team determined that special transportation services were required with accommodations and modification, but none were selected. Bd.Ex. 10, p. 10. As in the previous year, Student was to be given notice of all extracurricular activities, and the team determined that ESY services are not necessary. ESY is for students who regress, not progress like Student. Tr. 52-53, 324. All sections of the IEP were discussed at the meeting, including ESY. Tr. 323-324.

Mother signed this IEP, giving consent to the District to implement it. Bd.Ex. 10, p.14. Mother received a copy of the Procedural Safeguards Notice and a copy of the IEP was given to Parent at the meeting. Tr. 882; Bd.Ex. 10, p.14.

Two days after this IEP meeting, on November 9, 2014, Parent removed Student from Crouse and stated that she was moving in with her parents. Tr. 1018. She brought thank you notes and gifts for Hudson and MacCluskey on Student's last day. Tr. 302. Before he left Parent never complained about Student's IEP, never complained about the educational services he received, including any complaints about not getting accommodations in his general education class, never

18

organize Appellant's review issues under the three grounds stated in her supplemental notice of appeal and will organize all issues raised in her SLR "brief" under the appropriate appeal ground. Issues that were raised by Appellant in her due process complaint but not addressed in the SLR brief, if any, are considered withdrawn and will not be addressed.[9]

Parent appeals the decision, assigning three grounds:

**1.     Appellant disagrees with the findings of fact and conclusions of law of [IHO] as issued June 11, 2015.**

**Denial of FAPE**

Parent contends that [the District] committed procedural errors and did not develop an IEP reasonably calculated for the child to receive educational benefits. Parent claims as a result Student was denied educational opportunities, deprived his parents of meaningful input and caused a deprivation of educational benefits.

IDEA provides that, at the beginning of each school year, a school district "shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program." 20 U.S.C. § 1414(d)(2)(A). The IEP is a "written statement … that is developed, reviewed, and revised in accordance with § 1414(d)." 20 U.S.C. § 1401(14). The Supreme Court in *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), established a two-fold procedure for determining whether FAPE has been offered. First, has the state complied with the procedures set forth in the Act? And second, is the IEP developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? Id. at 206. The Court went on to establish that IDEA does not require a school district to provide the best possible educational program for a disabled child, but only an appropriate education at the public's expense. (See *Wise v. Ohio Dept. of Educ.*, 80 F.3d 177 (6th Cir. 1996), citing *Rettig v. Kent City*

---

9The issue about the District's alleged failure to conduct a manifestation determination is considered waived.

21

*School District*, 720 F.2d 463 (6ᵗʰ Cir. 1983). The educational benefit must be "meaningful," not merely a "*de minimus*" educational benefit. *Deal v. Hamilton Cty. Bd. Of Educ.*, 392 F.3d 840, 853-854 , 862-863 (6ᵗʰ Cir. 2004).

Since the Parent is the party challenging the provision of FAPE, she has the burden to prove her contention by a preponderance of the evidence. *Schaffer v. Weast*, 126 S.Ct. 528 (2005); *Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir.1990); *Dong ex rel. Dong v. Bd. of Educ. of the Rochester County Sch.*, 197 F.3d 793, 799 (6th Cir. 1999). O.A.C. 3301-51-05 (K)(22)(a).

In support of this contention, Parent addresses a broad swath of issues that led to Student's denial of FAPE.

**IEP did not address all of Student's needs**

Parent contends that the IEPs ignore Student's unique needs, including the concussions he sustained, his self-esteem issues, his self-consciousness, his needed accommodations for extracurricular activities, his mood swings, his need for counseling, his aggression/defiance, his attention issues, his allergies to peanuts, nuts, lagoons (sic), penicillin, beans and they fail to provide any plan if he were to be exposed to an allergen, his asthma or inhaler issues, his numerous absences due to his medical conditions, his digestive issues, his behavior or provide him a behavior plan, his discipline issues, his anger, the bullying he was subjected to, his frequent moving or transferring from schools, the accommodations he needs on his bus, his issues with socialization, his inability to complete the copious amounts of homework assigned to him, techniques that work well for Student, his fractured back, and the reasons why he is not educated in the LRE. Two of these issues, the peanut allergy and the bullying, will be discussed separately.

Virtually the only witness asserting that all of these issues should be addressed in Student's IEPs is Mother. Mother does not further explain why any of these issues should be included in Student's IEPs. The fact finder, the IHO, is in the best position to make credibility determinations

22

and she did not find that Mother credible. Parent signed both of these IEPs, giving consent to the District to implement them and did not object to the school about any services before filing her complaint.

Parent did not carry her burden to show that Student had a number of these unique needs: accommodations for extracurricular activities, mood swings, need for counseling, aggression/defiance, digestive issues, absences due to medical conditions, need for a behavior plan, discipline issues, anger, issues with socialization, inability to complete the copious amounts of homework assigned to him, and fractured back. These will not be considered further.

Nondisabled students also experience medical, social/psychological and behavior issues. Eligibility for special education services is determined by the evaluation team, pursuant to O.A.C. 3301-51-06. It is not enough to show that a student has a disability; it must also be shown that the student who has a disability "by reason thereof, needs special education and related services." O.A.C. 3301-51-01(B)(10). Ohio regulations define the qualifying disabilities for eligibility for special education. O.A.C. 3301-51-01(B)(10). Intellectual disability (formerly cognitive disability) is included in the list and defined. O.A.C. 3301-51-01(B)(10)(d)(ii). Student was found eligible under that category.

Parent did not prove by a preponderance of the evidence that any of these other medical or behavior issues, including his self-esteem and self-consciousness issues, were identified by either the 2012 or 2015 evaluation teams as disabilities qualifying him for special education and related services, nor that they should have been so identified. Although Mother did report that Student had asthma, allergies and digestive issues at the time of the reevaluation and, later, reported his concussion when that occurred, there was no proof offered to the evaluation team about the severity of any of these conditions. Parent did not carry her burden to prove how any medical issue required any special education services beyond those offered, including his one concussion that

23

occurred after the first IEP (and was resolved before the second one), and his asthma issue.

Although Parent did prove that Student had an attendance problem, Parent did not prove by a preponderance of the evidence that the absences were related to medical issues or that Student had significant medical issues that would warrant these numerous absences in the 2013-2014 school year or the 2014-2015 school year. Student's absences, something over which the District has no control, were noted on the 2014-2015 IEP as an interruption to his educational process. Parent did not prove why all or almost all of these absences were marked "excused." The evidence established that there was no reason for the three absences over the September 30, 2014 incident, yet they were probably included as excused absences since Mother brought in a medical note, even though the typed portion of the note only verified he was seen on October 1st. Further, the absence records were inconclusive and unclear. For example, it is unclear how the Student transcript report could contain 2015 absences when it was printed on December 18, 2014. Also, the transcript report recorded absences on a calendar year total instead of a school year total, making it difficult to identify trends.

Student had attention and behavior issues in the 2013-2014 school year. Not every attention and behavior issue must be addressed in an IEP. Student was receiving weekly counseling with the school-based counseling program during that year. The 2013-2014 IEP team concluded that Student did not have behavior which impedes his learning or the learning of others. Mother consented to the 2013-2014 IEP in November and did not object to the services.

Although the 2014 reevaluation assessed Student for his attention/hyperactivity symptoms, and the ETR acknowledged that his diagnosis of ADHD, the team concluded that his ADHD was secondary to the cognitive disability and, thus, was not the qualifying disability. Recommendations were made that included accommodations to address Student's attention issues in his 2014-2015 IEP, but by the start of the 2014-2015 school year, Parent had started Student on Ritalin and his

24

attention and behavior issues evaporated. Thus, the 2014-2015 IEP again noted that Student did not have behavior which impedes his learning or the learning of others.

As to the remaining educational issues, special transportation services were required with accommodations and modification in the 2013-2014 and 2014-2015 IEPs, but no selection was made as to what type, as required by the form. Mother agreed to both of those IEPs, however, and never raised an issue about the blanks at the transportation section. This is a minor flaw in the IEPs and does not rise to the level of a procedural error under IDEA. Student was provided van transportation at all relevant times and Student had no problems on his van transportation as a result of this error. Mother's expressed concern was about peanuts being brought on the van but the District does not allow food of any kind on its buses.

Even had there been any procedural violation here, which has not been shown, a procedural violation of IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of FAPE only if such violation causes substantive harm to the child or his Parent. *Knable v. Bexley City School District*, 238 F.3d 755, 765 (6th Cir. 2001). Substantive harm occurs when the procedural violations seriously infringe upon the parent's opportunity to participate in the IEP process. It may also occur when an eligible student is deprived of an IEP or suffers a loss of educational opportunity. *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 109 (6th Cir. 1992). Parent did not carry her burden to show substantive harm to her or Student.

Parent did not carry her burden to establish what "techniques that work well for Student" were allegedly omitted from his IEP. It is not a violation of IDEA if the team fails to adopt Parent's suggestions as long as Parent's suggestions are considered. Further, Parent did not prove that the 2014-2015 IEP omitted the reasons why he is not educated in the LRE. The IEP does state the reasons. The IHO granted a directed verdict on the issue of LRE as no evidence was offered at the

hearing to support this claim. The IHO did not err in granting the directed verdict.

Parent was unable to show how Student's frequent moving or transferring from schools, caused by Parent, was a special education issue. Under IDEA, districts are required to provide special education services to qualifying students who avail themselves of the services. Parent, in her zeal to protect her child from his allergies and other perceived medical problems, has lost sight of Student's paramount need for consistent educational services.

**Student's safety was not addressed in the IEP**

It is difficult to find a special education issue in this section of Parent's brief. This section is primarily focused on the September 30, 2014 incident at Crouse. Parent contends that Student's 2014-2015 IEP team failed to consider Student's Allergy Action Plan or address it in the IEP. Although Student's "peanut allergy" was mentioned in the due process complaint among multiple issues, this became Parent's primary issue at the hearing, particularly with respect to the September 30, 2014 incident, despite the fact that Student's peanut allergy was not and had never been Student's qualifying disability. Allergies affect a significant portion of the District student population at any given time. They affect disabled and nondisabled children alike.

Parent did not prove by a preponderance of the evidence that Student suffered any allergic reaction at any time during his enrollment at District schools, nor did she prove that the District school failed to do anything proper with the Plan, nor that the District put Student in any jeopardy due to his allergies. There was ample evidence supporting the opposite conclusion that Student did not suffer any allergic reaction at any time while at District schools, that the District school handled and followed the Plan properly, and that the District staff did everything in their power to protect Student from allergy triggers while in their care. The only testimony to the contrary was Mother's.

In support of her claim, Mother cites to a case that considered the school's responsibility

26

with a special education student with a peanut allergy. *In Re Student With a* Disability, 114 LRP 19510 (SEA KY 02/12/12). This administrative decision is distinguishable because the child there was found eligible for special education services, in part, under the category "other health impaired" due to his severe peanut allergy.[10] Here, no nexus has been established between the Student's peanut allergy and his eligibility for special education services. Even in that case, the ruling was in favor of the District because it provided a reasonably safe school environment (as opposed to a peanut-free environment), which the District did as well.

Asthma and allergy conditions in children are worrisome for parents and most parents would go to great lengths to protect their children, but schools are no responsible for parental overreactions as occurred here. Instead of being relieved to see her son was not suffering an allergic reaction and was happily going about his school day, Mother overreacted and, causing Student to become upset and caused him to suffer another disruption to his educational program.

**Measurable annual goals**

Federal and state law under IDEA require generally that the IEP contain the present levels of educational performance and measurable annual goals, including benchmarks or short-term objectives, related to the child's needs. 20 U.S.C. 1414(d)(1)(A)(ii); O.A.C. 3301-51-07 (H)(1)(a) and (c).

Parent contends that the Student's IEPs were defective because they did not contain "measurable annual goals" as required, except for the math goals. In support of this, Mother focuses primarily on the 2014-2015 IEP, arguing that not only did she not understand these goals but all of the IEP team members didn't either. Parent's claim is short on specifics. She claims that two of the four remaining goals of the 2014-2015 IEP are deficient: Goal # 1 (Speech) and Goal #

---

10 As the IHO noted in her decision, some children could be eligible for special education services on the basis of a peanut allergy due to the severity of the allergy, some of which could warrant home based instruction, or a 504 Plan.

27

2 (OT).[11] His OT goal continued to focus on improving his writing skills with a focus on improving his recognizable letter formation, spacing between words, letter sizing, and placing letters on the writing line. Parent argued that because the speech pathologist did not understand the term used in the new objective #2.1 and 2.2 under the OT goal of "adapted paper with clearly defined boundaries" that the IEP was deficient. Parent does not even attempt to articulate what is deficient in the Speech goal. She merely repeats the goal in her brief.

Mother  participated in the team that drafted these goals, and signed in agreement. Parent did not carry her burden to show that these goals (in both IEPs) were not measurable or failed to comply with federal or state law.  Each goal was specific, built on Student's present levels of performance, were annually measurable, and included specific objectives and benchmarks.

IDEA does not require that all team members understand all goals or objectives of an area of the IEP that is not within their province. It is important that the provider of the educational service understand the goal and objective. Parent proposes that we adopt the "stranger test." *Mason City Cmty. Sch. Dist.*, 46 IDELR 148 (SEA IA 2006).  Parent submits no legal authority that this jurisdiction had adopted the "stranger test" and this SLR declines to adopt this as the appropriate standard in determining the adequacy of IEP annual goals and objectives.

**Bullying constitutes a denial of FAPE**

Parent asserts that the IEP was deficient in that it failed to address the bullying Student was subjected to. The bullying of a student with a disability that results in the student not receiving meaningful educational benefit constitutes denial of FAPE that under IDEA must by remedied. See *Dear Colleague Letter*, 61 IDELR 263 (OSERS/OSEP 2013).

Before any finding that bullying did result in the student not receiving meaningful educational benefit, there must be proof that the student was bullied. In her due process complaint,

---

11 Deficiencies in the goals and objectives in Student's the 2013-2014 IEP are referenced simply as "the same problem with his previous IEP."

Mother alleged one incident, claiming Student was harassed at Voris and he was suspended. At the hearing Mother expanded the scope of the bullying claim, claiming Student was bullied consistently at Glover, Crouse and Leggett, but offered few specifics about the alleged bullying. Once again, the only witness supporting Mother's factual contentions about bullying was Mother. Mother had no direct observations of any bullying. All of her assertions were based on reports to her by Student when he was in the first, second and third grade. Contradicting Mother were a number of facts. School records showed that Student was the bully not the victim in first grade at Voris, the May, 2014 ETR that Mother agreed to stated that Mother denied any incidents of bullying, and there was no evidence from Glover, Crouse or Leggett verifying any incidents of bullying, there was no evidence verifying any reports about bullying were ever The IHO finding that Mother's testimony was "fraught with inconsistencies and therefore not credible" and this review officer's supportive finding that not only was her testimony internally inconsistent, but her testimony was diametrically opposed to other witnesses and evidence on a number of key facts leads to the logical conclusion that Mother did not prove by a preponderance of the evidence that Student was a victim of bullying.

Parent did not carry her burden to show that the failure to address bullying in the IEP caused a a denial of FAPE.

**Deprivation of educational opportunities**

In her due process complaint, Parent alleged that the District deprived Student of educational opportunities. In her brief, Parent contends this includes a denial of participation in field trips, riding the bus with other students, providing accommodations to participate in extracurricular activities, segregating Student from other children during breakfast and lunch, by failing to address his excessive absences.

Mother claimed that Student went on a field trip while at Leggett, but was vague as to

when. If Parent ever drove her son to a field trip, such as Hale Farm, it was because she refused to allow her son to ride the bus with the other students. The District did not allow children to have food on the bus and was willing to take any reasonable precautions to protect Student on the field trip. Both IEPs provided that Student would have access to extracurricular activities the same as nondisabled students. Activities such as field tripswere included in the school's curriculum to enhance the education of students. Mother participated in the IEP team that drafted these goals, and signed in agreement. There was no evidence of any extracurricular activity that Student was excluded from in the applicable time period. The only after school program that was in evidence was the third grade reading guarantee program that Mother expressly declined and was not even relevant to Parent's complaint because it occurred after the filing of the due process complaint. Mother's insistence that she provide transportation for her son on school field trips involved issues related to her fears that there would be peanut products either at the destination or on the school bus. Once again, the only witness to attest to these allegations was Mother and her allegations were disputed by the District.

Parent did not prove by a preponderance of the evidence that the District ever restricted Student from going on a field trip during the relevant time period, that he was denied any necessary accommodation to participate in extracurricular activities or that he was segregated from other children during breakfast and lunch. During the 2013-2014 and early 2014-2015 school years at Glover the principal and Mother agreed that Student would eat in the busy office for breakfast on the once a week peanut butter days. The only other time that Student did not eat with his peers was on September 30, 2014 at Crouse when Student's grandfather enthusiastically authorized his segregation with his intervention specialist for breakfast. These incidents do not constitute segregation, nor did it deprive Student of "educational opportunities."

Parent asserts that Student's excessive absences for medical reasons should have been

30

addressed in his IEP. This issue has been resolved above. Parent did not carry her burden to prove that Student was deprived of educational opportunities.STOP

**Failure to implement/lack of progress on IEP goals**

These two issues are related and are considered together. Parent argues here that Student did not receive individualized instruction in all academic areas, did not consistently receive the indicated accommodations, such as a wiggle seat, multiplication chart, modified homework, and that Student was making very little progress toward his goals in speech, vocabulary and reading. Further, Parent contends that the IEP goal of mastering reading at the 3rd grade level was inadequate as it was an impossible goal based on his current kindergarten level of reading fluency.

The 2014-2015 IEP required individualized instruction in the three areas of occupational therapy, writing and math. In support of her assertion that he did not receive individualized instruction in all academic areas, she bases that on the private neuropsychological evaluation report that she obtained in July of 2014. This report came after the ETR and, thus, was not available at the 2013-2014 IEP meeting. There was no evidence that Mother shared this report at the 2014-2015 IEP team meeting so the recommendations of this report would not have been considered and, thus, cannot be the basis for a claim that the IEP is inadequate. Even if it had been shared, the IEP team must consider the report it, but it is not required to incorporate it into the IEP. Parent did not carry her burden on proving the IEP was inadequate in failing to provide individualized instruction in all academic areas,.

Parent did not carry her burden that Student did not consistently receive the indicated accommodations, such as a wiggle seat, multiplication chart, and modified homework. Parent did not carry her burden that Student was making very little progress toward his goals in speech, vocabulary and reading. The only school identified by Parent for the claim of lack of progress on his goals was at Crouse. This would have been pursuant to the 2013-2014 IEP because Mother

removed Student from Crouse immediately after the 2014-2014 IEP. Math progress was not an issue in this case. There was ample evidence to show that Student made great progress on his reading, speech and OT goals while at Crouse and was continuing to make progress at Leggett, despite the interruption to his educational program by the transfer from Crouse to Leggett in November. Mother even expressed to the IEP team at Crouse that she was so impressed with Student's progress in the 2014-2015 school year and the lack of behavior problems.

Parent next contends that the 2014-2015 IEP goal of mastering reading at the 3rd grade level was inadequate as it was an impossible goal based on his current kindergarten level of reading fluency. Parent, who signed and approved the IEP, did not carry her burden to show that the reading goal was unrealistic.

In assessing Student's progress on his IEP goals, two significant factors which have been shown to impede his progress, at least theoretically, were his numerous absences and his numerous school transfers. Had Parent been able to show a lack of progress on Student's goals, that would not end the inquiry. Parent would also have to prove that any lack of progress was attributed to the deficiencies in the IEP or the implementation of the IEP, and not due to his numerous absences and school transfers.

**Lack of meaningful input/participation**

At the outset it is noted that the District asserts that this issue was not included in Parent's due process complaint and was added at the hearing. Although Parent did not specifically assert this ground, the allegations in her complaint were sufficiently broad ("District failed to provide an adequate IEP") that it is found to encompass this issue and the IHO considered it in her decision. Parent does not clarify whether she claims a lack of meaningful input/participation at the 2013-2014 IEP or the 2014-2015 IEP, but her sole contention in this section of her brief is that the District never considered ESY evidencing the IEPs were predetermined. At a later section of her

32

brief, Mother contends that she did make suggestions that were ignored by the team, such as an exercise band ( that she used when Student was in time out), adding behavior goals or services, making modifications to his homework, and allowing Student to use a calculator.

Where the school district had already predetermined the student's program and services before the IEP team meeting, the parents were denied the opportunity to meaningfully participate in the process. *Deal v. Hamilton* Co., 392 F.3d 840, 842 (6th Cir. 2004). School evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions. *Mrs. C. ex. rel. N.L. v. Knox County Schools*, 315 F.3d 688, 694 (6th Cir. 2003). See also *Nack v. Orange County School District*, 454 F. 3d 604 (6th Cir. 2006). IDEA does not require that IEP teams adopt a team member's suggestions, only that they consider them.

Extended school year services (ESY) are appropriate for a disabled child if the IEP team determines it is necessary for the provision of FAPE. 34 C.F.R. 300.106(a); O.A.C. 3301-51-02(G) (1)(b). Providing an ESY is the exception and not the rule under the regulatory scheme. *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990). It is incumbent upon those proposing an ESY for inclusion in the child's IEP to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid something more than adequately recoupable regression. Id.

Parent, who signed and approved both IEPs, did not carry her burden to show that ESY was not discussed at the 2013-2014 IEP meeting as very little evidence here concerned the 2013-2014 IEP team meeting. Whether it was discussed or not, there was no evidence that ESY was ever an issue for Mother until she filed her due process complaint. The evidence established that ESY was discussed at the 2014-2015 IEP meeting and the team concluded that ESY was not required because Student did not show regression. More importantly, Parent offered no evidence that

33

Student met the criteria for ESY, nor did Parent ever assert a need for Student to receive ESY services. The IHO granted a directed verdict on the ESY issue. This was not error.

Parent did not carry her burden to show that she was denied meaningful input because her suggestions related to the exercise band, adding behavior goals or services, making modifications to his homework, and allowing Student to use a calculator, even if made, were not adopted by the IEP team. According to her she was able to make these suggestions which showed she was an active participant on the team. The issue of behavior goals or services was resolved above. Parent did not carry her burden to prove that the District predetermined Student's services or she was not accorded meaningful input or participation at these two IEP meetings.

**Failure to Produce Records**

Parent claims she was denied Student's educational records, pursuant to FERPA. 34 C.F.R. § 300.611(b). First, this issue was not properly before the hearing officer because it was not raised in the due process complaint. Due process hearings are limited to facts raised in the due process complaint unless certain exceptions are met which are not met here. Second, even had this issue been raised in the due process complaint, due process hearing officers do not have jurisdiction over FERPA issues. See *Bd. of Ed of Duanesbury Cent. Sch. Dist.,* 20 IDELR 641, 645 (1993).

Third, Parent does not assert that records used by either party as evidence had not been properly disclosed five days prior to the hearing as required. At the hearing, Parent conceded that all records were received in the December 22, 2014 records production or were exchanged at the Disclosure Conference. Finally, there was no proof that any records issue impeded Parent's right to a meaningful participation in the due process hearing.

**Failure to Reconvene IEP Team**

Parent asserts that the District should have reconvened the IEP team after the Student had a disciplinary event, suffered a concussion, or had behavioral or digestive issues. Parent cites to no

34

legal authority for this proposition. Again Mother is the only witness in support of this contention. Parent did not carry her burden to prove that she ever requested the IEP team to reconvene or that there was any requirement that the IEP team reconvene.

**Inadequate ETR**

The final claim under this ground of appeal is that the ETR was inadequate. Parent contends that the District failed to complete the reevaluation within three years of the prior ETR, which was a violation of IDEA, that the ETR failed to consider Student's post-evaluation concussion (resulting from a bike accident about two weeks before the reevaluation team meeting) and that certain subtests were not administered because of his academic delays but should have been. Parent further claims that the District failed to reevaluate Student after all of his moves between schools, after the concussions he suffered, after the bullying, after missing days of school in unexcused absences due to his medical conditions, and after the incident where he was exposed to peanuts.

IDEA requires that special education students, after their initial evaluations, are reevaluated every three years to determine their continued eligibility for special education services and to determine the educational services for their IEP planning, unless the parties agree that a reevaluation is unnecessary. 34 C.F.R. § 300.303(b)(2). Parent did show that the District failed to complete the reevaluation within three years of the prior ETR. It should have been completed in February of 2015, instead of May. This was a procedural violation of IDEA, but that does not end the inquiry. There must also be a showing of substantive harm as a result of this procedural violation or a showing that an eligible student is deprived of an IEP or suffers a loss of educational opportunity.. Parent did not carry her burden to show substantive harm to her or Student over the ETR delay. The results of the reevaluation as to Student's cognitive delays was consistent with the prior evaluation, Student continued to receive special education services according to the IEP in

35

effect until the following year and the ETR did not call for any immediate changes to his educational services. The next IEP was actually completed early at Mother's request.

The psychological evaluation had been completed before Student's May concussion, but Parent did not prove that there was any reason to redo the cognitive testing and academic assessment portions of Bethem's eva;uationthe as a result of the concussion. Further, this would constitute a reevaluation that would not even be permitted without the agreement of the District. O.A.C. 3301-51-06 (D)(2)(a). Parent did not carry her burden to show that she ever asked the District to agree and there was no evidence that the District did agree so there was no showing the District violated the reevaluation provisions of IDEA.

Further, Parent participated on the reevaluation team, reviewed the report and signed her consent to the ETR after the concussion. Parent did not carry her burden to show that the fact that certain subtests were not administered because of his academic delays rendered the reevaluation deficient. In a reevaluation, the team determines what assessments shall be conducted and the individual assessor has discretion to determine what areas will be tested and what instruments will be used. If a parent challenges the appropriateness of the reevaluation, she has recourse to challenge it, which Parent did not do. Parent did not carry her burden to show that the choice of subtests used by the evaluator rendered the ETR inadequate.

Parent further claims that the District failed to reevaluate Student after all of his moves between schools, after the concussions he suffered, after the bullying, after missing days of school in unexcused absences due to his medical conditions, and after the incident where he was exposed to peanuts. Parent offers no legal authority to support her contention that any of these incidents, even if proven, required the District to reevaluate.

In conclusion, Parent did not carry her burden to show a denial of FAPE based on any of the above contentions.

36

This first ground of appeal has no merit.

2. **Appellant believes all of the claims raised below are valid and they (sic) did not receive a fair and impartial hearing.**

3. **Appellant believes the IHO in this matter was biased and unable to be impartial in this hearing.**

These grounds are related and will be considered together. Parent contends that all of the claims raised below are valid and she did not receive a fair and impartial hearing and the IHO was biased and unable to be impartial in this hearing. These grounds asserted by Parent are couched in "belief" as opposed to fact. In support of this assertion, Parent claims that the hearing officer made a mockery of the system by misrepresenting "facts," writing incorrect conclusions of law, improperly defaming Parent's counsel, making numerous spelling, grammar and punctuation mistakes, and otherwise did not meet the minimum level to be an independent hearing officer. [12]

The due process hearing officer is required to be impartial. O.A.C. 3301-51-05 (K)(8)(d) and (K)(10)(c). Parent did not show that the IHO misrepresented "facts." No specifics are given by Parent. Any mistakes in the IHO's findings of fact were harmless error and were not shown to affect any of her conclusions of law. Any erroneous factual findings have been corrected in this decision.

No errors have been established in her conclusions of law as this review officer has affirmed all of them. Since this review officer has now ruled that all of Appellant's claims are not valid, it would be difficult to persuade this review officer that Appellant did not receive a fair and impartial hearing. Parent has not shown that the IHO made numerous spelling, grammar and punctuation mistakes. Any spelling, grammar and punctuation mistakes the IHO made were minor. Parent did not show that the IHO otherwise did not meet the minimum level to be an independent

---

12 Appellant also seeks to incorporate all motions filed with the brief in support of these grounds of her appeal. This request is denied.

hearing officer. The assertion found in footnote 1 of Parent's brief is lacking in any detail and inadequate to support a claim of lack of impartiality.

The only one of Parent's claims here that could connect to a claim of impartiality or bias, is the one claiming she improperly defamed Parent's counsel. Although, like all judicial and quasi-judicial officers, this hearing officer enjoys immunity when acting in her capacity from any claim of defamation, the record has been reviewed to determine if the hearing officer ever engaged in conduct that exhibited bias toward Parent or her counsel. There was no such evidence in the record. The hearing officer's conduct of the hearing demonstrates her goal of ascertaining the facts and making a fair and timely determination which is her job. The hearing officer conducted her hearing in an appropriate manner. Any expressions of dissatisfaction to Parent's counsel were understandable based on the facts, for example, Parent's counsel's unorganized exhibit binder, his lateness to court on one occasion, and his request for a continuance based on his inability to issue subpoenas in a timely fashion.

Allegations of hearing officer bias and lack of impartiality are rarely successful. An IDEA hearing officer enjoys a presumption of honesty and integrity that may be overcome only by a showing of bias. *AM v. Dist. Of Columbia*, 933 F.Supp.2d 193, 61 IDELR 21 (DDC 2013). A court has rejected any theory of bias based on claims that hearing officer expressed impatience, annoyance and even anger. *MN v. Rolla Public Sch. Dist.*, 59 IDELR 44 (WD Missouri 2012).

The second and third grounds of appeal have no merit.

## V.    REMEDY

Because Parent did not prove that the District denied Student FAPE, that the IHO denied her a fair and impartial hearing or that the IHO was biased or unable to be impartial, it is not necessary to discuss her requested remedies as outlined in her due process complaint and brief.

## VI.    CONCLUSIONS OF LAW:

38

In conclusion:

Student's disabilities did not require extended school year (ESY) services in order to provide him FAPE.

Student was educated by the District in the least restrictive environment (LRE).

The Akron Public Schools is not impermissibly segregating the Student from his peers at breakfast, lunch or on field trips in violation of the IDEA.

Student's Action Plan or a safety plan is not required to be part of his IEP.

The District properly implemented the Student's IEP during the 2013-2014 and 2014-2015 school years.

The 2014-2015 addresses all Student's unique needs and contains measurable goals and objectives.

Student was not deprived of educational opportunities while at District schools.

Student made measurable progress on his IEP and has received meaningful educational benefit.

Student's parents were provided meaningful opportunity to participate in the ETR and IEP meetings.

The District provided records to the Appellant and there was no proof of lack of access to records that seriously infringed on Appellant's opportunity to participate in the due process hearing.

The records issue was not properly before the IHO and the IHO did not have jurisdiction to hear records issues under FERPA

The District was not required to reconvene an IEP team after Student suffered a concussion or had a disciplinary event or had behavioral or digestive issues.

The 2014 Evaluation Team Report (ETR) is complete, thorough and adequate and there

was no substantive harm to Student because the ETR was late

The District has provided a free and appropriate public education (FAPE) to the Student.

The IHO was not biased and did not deny Parents a fair and impartial hearing.

The IHO's Decision and Order is affirmed.

Monica R. Bohlen 0017983
State Level Review Office
10 Judith Street
Charleston, SC 29403-6311
(513) 324-3954

## CERTIFICATION OF DECISION AND ORDER

I, Monica R. Bohlen, am a State Level Review Officer (SLRO), for the Ohio Department of Education (ODE).  I have served as a SLRO in the matter of Jeremy Barney and the Akron Board of Education, SLR 3042-2014. I hereby certify that the attached document is a true, accurate, and complete copy of the Final Decision and Order which I issued on November 9, 2015, in the matter of the State Level Review regarding Jeremy Barney and the Akron Board of Education.

_____
Monica R. Bohlen
State Level Review Officer (SLRO)

November 9, 2015
Date

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served upon Parents, Lester and Delaina Barney, 329 Arch St., Akron, Ohio 44304, David James, Superintendent, Akron Public Schools, 70 N. Broadway Street, Akron, Ohio 44308, Jason D. Wallace and Daniel R. Bache, Roderick Linton Belfance LLP, Attorneys for Parent, 50 S. Main Street, 10th Floor, Akron, Ohio 44308 and Rhonda J. Porter, Attorney for the District, General Counsel, Akron Board of Education, 70 N. Broadway, Akron, Ohio 44308-1999, by ordinary mail and electronically to counsel on this the 9th day of November, 2015.

_____
Monica R. Bohlen
State Level Review Officer (SLRO)

41

# NOTICE OF OPPORTUNITY TO BRING CIVIL ACTION TO
# APPEAL DECISION OF STATE LEVEL REVIEW OFFICER

If you are not satisfied with the findings and decision of the state level review officer, you have the right to bring a civil action to appeal the decision, in writing, under Revised Code Section 3323.05(H) and Rule 3301-51-05(K)(17). You may file your civil action:

a.  In the court of common pleas of the county in which the child's school district of residence is located within **45 days** of notification of the order of the state level review officer, under Chapter 119, of the Revised Code, as specified in Revised Code Section 3323.05(H), **or**

b.  In a district court of the United States within **90 days** from the date of the decision of the state level review officer regardless of the amount in controversy, as specified in 20 U.S.C. 1415(i)(2) and 34 C.F.R. 300.516.

### Filing in Common Pleas Court

If you bring your civil action in Ohio common pleas court, within **45 days** of notification of the order of the state level review officer, you must file:

1.  A Notice of Appeal setting forth the order appealed from and stating that the SLRO's order is not supported by reliable, probative, and substantial evidence.  If you wish, you may provide detail regarding the grounds for your appeal.

2.  The Notice of Appeal must be filed with **both** the clerk of the court of common pleas and the Ohio Department of Education **within the 45 day timeline.**  The address for the Ohio Department of Education is:

    > Ohio Department of Education
    > Office for Exceptional Children
    > Procedural Safeguards Section
    > 25 South Front Street, Mail Stop #202
    > Columbus, Ohio 43215-4183

3.  You must mail a copy of the notice of appeal to the other party to the due process hearing.

### Filing in Federal District Court

If you choose to bring a civil action in the United States district court, **within 90 days from the date of the decision of the SLRO**, you must file your civil action in

accordance with the court's requirements. You should call the clerk for the United States district court to determine that court's filing requirements.